UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X          15-CV-6084 (ARR)(LB)

SHULAMIT MIZRAHI,

                 Plaintiff,

            v.

THE CITY OF NEW YORK, POLICE
OFFICER JUN CHEN, POLICE OFFICER
JOSEPH CORRADO, THE NEW YORK AND
PRESBYTERIAN HOSPITAL (a/k/a NEW
YORK PRESBYTERIAN HOSPITAL),
NOVELEEN NELSON, and SATISH
ABEELUCK,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

*PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT*

Law Office of
  Nathaniel B. Smith
225 Broadway – Suite 1901
New York, NY 10007
212-227-7062
natbsmith@gmail.com
Attorney for Plaintiff

Dated:  December 11, 2017

*TABLE OF CONTENTS*

Preliminary Statement...................................................................................................................1

Factual Background ........................................................................................................................3

Argument ......................................................................................................................................3

   I.  The Defendants Are Not Entitled to Summary Judgment
      on the Warrantless Entry Claim..........................................................................................3

      A.  The Defendants Lacked Both Probable Cause and Exigent Circumstances.....................3

      B.  The Defendants Are Not Entitled To Qualified Immunity ...............................................10

  II.  The Defendants Are Not Entitled to Summary Judgment on the
      Illegal Seizure Claim..........................................................................................................13

      A.  There Was No Basis to Seize Mizrahi .............................................................................13

      B.  The Defendants Are Not Entitled to Qualified Immunity................................................19

 III.  There Are Dispute Issues of Fact on the Joint Action Issue ...................................................22

 IV.  The Defendants Are Not Entitled to Summary Judgment
      on the Common Law Claims ...............................................................................................27

      A.  The Intentional and Negligence Infliction of Emotional Distress Claims.......................27

      B.  The Negligent Training Claims........................................................................................30

Conclusion ..................................................................................................................................31

*TABLE OF AUTHORITIES*

*Addickes v. S.H. Kress & Co.,* 398 U. S. 144, 152 (1970) ......................................25

*Allison v. New York*, 2011 U.S. Dist. LEXIS 109683 at *7

  (W.D.N.Y. Sep. 25, 2011) ..................................................................13

*Baker v. Dorfman*, 239 F. 3d 415, 421 (2d Cir. 2000) ...........................................29

*Bauer v. City of Hartford*, 2010 U. S. Dist. Lexis 115199 at *23-24

  (D. Conn. Oct. 29, 2010) ...................................................................12

*Bender v. General Services Admin*., 539 F.Supp.2d 702, 714 (S.D.N.Y. 2008).....12

*Breitbard v. Mitchell,* 390 F. Supp. 2d 237, 248 (E.D.N.Y. 2005) ..........................7

*Bumper v. North Carolina,* 391 U. S. 543 (1968) ...................................................17

*Dennis v. Sparks*, 449 U. S. 24, 27-28 (1980) .........................................................25

*Detone v. Bullit Courier Serv., In*c., 140 A.D.2d 278, 279, 528 N.Y.S.2d

  575, 576 (1ˢᵗ Dept. 1988) ..................................................................30

*Gorzynski v. JetBlue Airways Corp*., 596 F.3d 93, 104 (2d Cir. 2010)....................7

*Harlow v. Fitzgerald*, 457 U. S. 800, 819 (1982)...............................................11, 21

*Harris v. O'Hare*, 770 F. 3d 224, 231-32 (2d Cir. 2014).........................................3

*Howell v. New York Post*, 81 N. Y. 2d 115, 121 (1993).........................................27

*Hurlman v. Rice,* 927 F. 2d 74, 81 (2d Cir. 1991).....................................................4

*Johnson v. State,* 37 N.Y. 2d 378, 381, 372 N.Y.S.2d 639, 642 (1975).................29

*Johnson v. United States*, 333 U. S. 10, 13 (1948)....................................................17

*Jones v. County of Suffolk,* 164 F Supp. 3d 388, 396-97 (E.D.N.Y. 2016)............26

*Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991 ......................................22

*Kerman v. City of New York*, 261 F. 3d 229 (2d Cir. 2001) ............................ passim

*LeBlanc v. United Parcel Serv*., 2014 U.S. Dist. LEXIS 50760 at *9

   (S.D.N.Y. Apr. 11, 2014) ....................................................................................7

*Lozada v. Weilminoter*, 92 F. Supp. 76, 104 (E.D.N.Y. 2015)................................12

*McCrink v. New York*, 296 N.Y. 99 (1947) ............................................................30

*Ong v. Park Manor*, 2017 U.S. Dist. Lexis 164270 (S.D.N.Y. Sept. 28, 2017) .....12

*Richardson v. McKnight*, 521 U.S. 399, 404-412 (1997)........................................12

*Ruhlmann v. Ulster Cty. Dep't of Soc. Servs.*, 234 F. Supp. 2d 140, 169-70

   (N.D.N.Y. 2002)...........................................................................................4, 19

*Schneckloth v. Bustamonte,* 412 U. S. 218 (1992) .................................................18

*Singer v. Fulton*, 63 F. 3d 110, 118 (2d Cir. 1995) ................................................13

*Sylvester v City of New York,* 385 F Supp. 2d 431, 443-44 (S.D.N.Y.2005) ..........31

*Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*, 2017 U.S. Dist. LEXIS

   173922 at *10 (D. Conn. Oct. 20, 2017) .............................................................6

*Toussie v. Powell*, 323 F.3d 178, 183 (2d Cir. 2003) .............................................12

*Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 455

   (S.D.N.Y. 2012)....................................................................................4, 12, 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SHULAMIT MIZRAHI,

    Plaintiff,

   v.

THE CITY OF NEW YORK, POLICE
OFFICER JUN CHEN, POLICE OFFICER
JOSEPH CORRADO, THE NEW YORK AND
PRESBYTERIAN HOSPITAL (a/k/a NEW
YORK PRESBYTERIAN HOSPITAL),
NOVELEEN NELSON, and SATISH
ABEELUCK,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

15-CV-6084 (ARR)(LB)

**PLAINTIFF'S MEMORANDUM
OF LAW IN OPPOSITION TO
THE DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

*Preliminary Statement*

  Plaintiff, Shulamit Mizrahi ("Mizrahi"), submits this memorandum of law in opposition

to the motions for summary judgment by the NYPD and the EMT Defendants.  The NYPD and

EMT Defendants[1] argue that they are entitled to summary judgment on the claim against them

for their warrantless entry into Mizrahi's home on the ground that exigent circumstances justified

the entry.   The Defendants also argue that they are entitled to summary judgment for their

mental health seizure of Mizrahi on the ground that an objectively reasonable officer would have

concluded that he or she had probable cause to seize Mizrahi as an emotionally disturbed person.

Alternatively, the Defendants argue that they are entitled to summary judgment on the ground

---

[1]  As used in Mizrahi's motion for summary judgment, the NYPD Defendants are defined to
include Police Officer Chen, Police Officer Corrado, and their employer, the City of New York,
and the EMT Defendants are defined to include EMT Nelson, EMT Abeeluck, and their
employer, the New York Presbyterian Hospital.

that the facts conclusively establish that Mizrahi "consented" to the entry into her home and then "consented" to being taken to the hospital for a psychiatric evaluation.    Since the Defendants' motions hinge on disputed factual issues about exigent circumstances, probable cause, and consent, summary judgment should be not granted.

Nor are the Defendants entitled to qualified immunity.  Whether their actions were objectively reasonable also depends on disputed issues of fact, rendering summary judgment improper.

The Defendants also seek dismissal of Mizrahi's common law claims.  Based on the Court's prior review of the proposed grounds for summary judgment at the pre-motion conference, Mizrahi agrees to withdraw her common law claims for (a) negligent misrepresentation, (b) negligent care and treatment, and (c) general negligence.  On the other hand, Mizrahi maintains that there are genuine issues of material fact on her claims for intentional and negligent infliction of emotional distress and her claim for negligent training.

As set forth in more detail below, the Defendants' forcibly removed without any reasonable basis a single 48-year old woman from her home and took her to a psychiatric ward late at night, providing hospital staff with misleading and false statements about her mental health.  Mizrahi contends that this conduct is outrageous precisely because it violates basic norms of a civilized society, including the security of a person in their body and the sanctity of their home.  In addition, Mizrahi contends that valid claims for negligent training have been set forth against the City of New York and New York Presbyterian Hospital because their employees admitted at their depositions that they never had any training on the determination of whether a person is emotionally disturbed or that they were not qualified to determine whether a person is emotionally disturbed.

*Factual Background*

The background facts in this action are set forth in Mizrahi's Rule 56.1 Statement, which is submitted in support of her motion for partial summary judgment, and Mizrahi's Rule 56.1 Responsive Statement, which is submitted in connection with the Defendants' motions for summary judgment.   Since the underlying factual background and the governing standard for summary judgment has already been set forth, Mizrahi respectfully refers the Court to those prior submissions and turns directly to the arguments made by the Defendants in their motions.

*Argument*

## I.  The Defendants Are Not Entitled to Summary Judgment on the Warrantless Entry Claim.

The NYPD and EMT Defendants argue that their warrantless entry into Mizrahi's home was justified because there were exigent circumstances justifying their entry.   In the alternative, they argue that Mizrahi consented to their entry.   Since there are numerous issues of material fact regarding the entry claim, summary judgment should be denied.

### A.  *The Defendants Lacked Both Probable Cause and Exigent Circumstances.*

"Because warrantless searches of the home are presumptively unreasonable in the absence of a warrant, police officers need probable cause *plus* exigent circumstances in order to make a lawful entry into a home."[2]  Here, the NYPD and EMT Defendants cannot establish either probable cause or exigent circumstances as a matter of law.

Probable cause in the mental health context requires proof that the police officers had reasonably reliable information that would lead a person of reasonable caution to conclude that

---

[2] *Harris v. O'Hare*, 770 F. 3d 224, 231-32 (2d Cir. 2014) (emphasis added).

Mizrahi was dangerous to herself or others.[3]  Probable cause necessarily "entails an inquiry into the facts known to the officer at the time of the arrest.[4]  In addition, exigent circumstances require proof that the police officers were confronted with an urgent need to render aid or take action.[5]  Mere possibilities are not sufficient:  "If the mere possibility of danger constituted an emergency, officers would always be justified in making a forced entry."[6]

By their motions, the Defendants seek to conclusively establish as a matter of law probable cause and exigent circumstances by relying on a call that a former male friend of Mizrahi made to the 911 operator that night.  Settled law, however, demonstrates that anonymous, unreliable or otherwise uncorroborated information is not sufficient to establish probable cause or justify an emergency home entry.

The evidence in this case shows that an unidentified male caller (later identified as Asher Adry) called the 911 operator at 8:40 PM on the evening of August 10, 2015, stating that "I think that she [referring to Mizrahi] is going to hurt herself."[7]  The male caller told the 911 operator that Mizrahi was at the "old" building on the corner of Avenue P and East 2nd Street ("I think") and an apartment on the third floor or possibly apartment 3A ("I think").[8]  The male caller provided Mizrahi's first and last name (but not his own name) and misspelled Mizrahi's name as

---

[3]  *See Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 455 (S.D.N.Y. 2012) (applying probable cause standard for criminal conduct to a mental health seizure). *See also Ruhlmann v. Ulster City Dep't of Soc. Servs.*, 234 F. Supp. 2d 140, 169-70 (N.D.N.Y. 2002) ("a seizure can be made only on probable cause that a person has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others") (quotation marks omitted).
[4]  *Zellner v. Summerlin,* 494 F. 3d 344, 370 (2d Cir.2007).
[5]  *Id.* at 233.
[6]  *Hurlman v. Rice,* 927 F. 2d 74, 81 (2d Cir. 1991).
[7]  Cherie Brown Exhibit ("Exh.") I; 911 MSG01.wav at 00:15.
[8]  *Id.* at 00:28-00:50.

"MIZRCHI."[9]

Based on the call, the 911 operator classified the call as an "EDP" job and assigned it to Nelson and Abeeluck as the responding EMTs, and Chen and Corrado as the responding NYPD officers.  Based on the information provided to Nelson by the 911 operator, Nelson and her partner, Abeeluck, went to the intersection of Avenue P and East 2nd Street and did not find anybody in need of assistance at that location.[10]   Similarly, Chen testified that he and his partner, Corrado, went to the intersection, did not see anybody in need of assistance, and asked the 911 operator to call the male caller back for additional information.[11]  When the 911 operator informed Chen that the call-back attempt went straight to voice mail, Chen marked the call as "unfounded" and he and his partner left.[12]

Meanwhile, Nelson and Abeeluck remained at the location and tried to get more information about the call.  Recordings of the exchanges between Nelson and the 911 operator show that Nelson repeatedly told the 911 operator that the information provided was *facially inadequate* to find Mizrahi and that they needed better information.[13]  Eventually and through no help from the male caller, Nelson located Mizrahi's building one block north on East 3rd Street and requested that the NYPD return to the scene.[14]

Eventually, at about 9:40 PM, nearly one hour after the initial 911 call, the NYPD

---

[9] Sprint Report at 20:45:59; Brown Exh. J.
[10] Nelson Tr. 55:17-56:3 & 57:10-14 (did not see anybody at the intersection in need of assistance); Gregory Radomisli ("Rad.") Exh. H.
[11] Chen Tr. 38:18-43:24; Rad. Exh J.
[12] Chen Tr. 43:9-24; Rad. Exh. J.
[13] Plaintiff's Opposition Exhibit ("POX") 1: Audio _91792 (Nelson needed address to go with the apartment); Audio _91794 (911 operator informs Nelson that the male caller does not know the address and Nelson tells the 911 operator that we don't know where is the "old" building and the "new" building at the intersection of East 2nd Street and Avenue P); Audio _91795 (requesting that the "friend" meet us because we don't know if the building is on East 2nd or Avenue P)

Defendants and the EMT Defendants knocked on Mizrahi's door.  According to the Defendants, Mizrahi opened the door and consented to their entry into her home.  That contention, however, is a hotly disputed issue of fact that cannot be resolved on a motion for summary judgment.

In her deposition, Mizrahi testified that when the Defendants rang the bell for the downstairs door she buzzed them in and that when they knocked on her door, she unlocked the door with the intention of telling them that she was fine.[15]  But before Mizrahi even had a chance to open the door, the individual Defendants, led by Nelson, pushed the door in, entered and immediately began yelling at Mizrahi to put her dog away, who was barking at the intruders.[16]

It is correct, as the Defendants point out, that in response to a question at her 50-h hearing about what she meant when she used the term "invasion," Mizrahi did say in passing that she "let them in"[17] but in the same answer, Mizrahi also said:  "*they open my door* and take me."[18]

Mizrahi's testimony at the 50-h Hearing is not inconsistent with the more specific testimony that Mizrahi gave at her deposition.  At her deposition, the questioning was far more focused on the specific facts relating to the defendants' entry.[19]  In addition, the audio recording of the entry corroborates Mizrahi's contention that the Defendants barged in and immediately started yelling orders at Mizrahi to put her dog away.  Accordingly, the "sham affidavit" rule, which prevents a person from using an inconsistent affidavit to create an issue of fact, does not apply because Mizrahi's prior testimony at the 50-h hearing did not thoroughly explore the entry issue and it is not inconsistent with her more specific deposition testimony.[20]

---

[14] Nelson Tr. 59:17-60:12; Rad. Exh. H.
[15] Mizrahi Tr. 294:24-295:10; Rad. Exh. G.
[16] Mizrahi Tr. 293:16-294:16; *see also* Audio Recording 0:00-0:10; Brown Exh. H.
[17] 50-h Hearing Tr. at 51:17; Rad. Exh. L.
[18] *Id.* at 51:21-22 (emphasis added).
[19] Mizrahi Tr. 293:16-295:10; Rad. Exh. G.
[20] *Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*, 2017 U.S. Dist. LEXIS 173922 at *10 (D.

Nor does the fact that Mizrahi unlocked her door with the intention of talking to the police constitute a waiver of her Fourth Amendment rights.  During the pre-motion conference, the Court referred the parties to authority for the proposition that the mere fact that a person opens her door does not mean that the person has waived her rights to be secure in her home.[21]

Since the Defendants' "consent" contention cannot be resolved as a matter of law, the Defendants' motion for summary judgment on the entry claim should be denied.  Uncorroborated information from an anonymous 911 caller does not provide probable cause for a warrantless entry into a person's home.

In *Kerman v. City of New York*, 261 F. 3d 229 (2d Cir. 2001), the Second Circuit held as a matter of law that an anonymous 911 call by a person saying that a man was recently off his medication and may have a gun was insufficient to establish probable cause justifying a warrantless entry into the person's home.  The unidentified 911 caller in *Kerman,* like the male caller in this case, also provided the 911 operator with the man's location and his telephone number.[22]

The Second Circuit held that the 911 call was insufficient as a matter of law to establish probable cause because there was no indication that the caller was reliable and the police had no

---

Conn. Oct. 20, 2017) ("This sham affidavit rule does not apply if the statements are not actually contradictory or the later sworn assertion addresses issues that were not thoroughly or clearly explored.') (citing *Markut v. Verizon N.Y. Inc.*, 758 F. 3d 202, 213 (2d Cir. 2014)); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) ("If, however, the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact sufficient to defeat summary judgment."); *LeBlanc v. United Parcel Serv.*, 2014 U.S. Dist. LEXIS 50760 at *9 (S.D.N.Y. Apr. 11, 2014) (noting that the sham affidavit rule will not bar an affidavit when the issue was not fully explored in the deposition, or the deponent's responses were ambiguous).
[21] During the parties' last conference with the Court, the Court cited to the parties the case *Breitbard v. Mitchell,* 390 F. Supp. 2d 237, 248 (E.D.N.Y. 2005) ("It cannot be said that plaintiff abandoned her privacy interest simply by opening the door to her home in response to the defendants' knock.")

corroborating evidence of the alleged danger.[23]  That holding applies with equal force in this case.

Indeed, the information that the NYPD and EMT Defendants had about Mizrahi at the time of their entry into her home was far less alarming than in *Kerman* because there was no reference to a weapon or to medication.  In addition, the particular facts in this case demonstrate that the NYPD and the EMT Defendants had good reason to believe that the 911 caller was in fact unreliable.  The 911 caller provided wrong information about the location of Mizrahi's building, the wrong apartment number, and the wrong spelling of her last name.  And, as a result of that wrong information, the NYPD Defendants initially marked the call unfounded and left the scene.  Indeed, it took the EMT Defendants and the NYPD Defendants nearly an hour to locate Mizrahi because of the caller's wrong information.

Thus, the basis for probable cause to justify the entry in this case is less compelling than the basis for probable cause urged (and rejected) in *Kerman.*   Accordingly, the Defendants cannot as a matter of law claim that they had probable cause to forcibly enter Mizrahi's home because of any "emergency" concern about Mizrahi.

Moreover, once Mizrahi rang them into the building, responded to their knock, and unlocked the door, the Defendants had the opportunity to obtain important information that Mizrahi had not in fact harmed herself.   The Defendants could have – and should have – spoken with Mizrahi at the threshold of her home (as a proper respect for the sanctity of the home and the Fourth Amendment requires) but instead barged their way in without permission or justification.  Hence, any possibility that there was a bona fine emergency immediately dissipated as soon as the Defendants made contact with Mizrahi when she buzzed them into the

---

[22] *Kerman*, 261 F. 3d at 232.

building.  In addition, reasonable officers having due respect for the Fourth Amendment should have spoken to her at the threshold of her door and confirmed that Mizrahi was unharmed and coherent, rather than force their way in.

In an effort to distinguish *Kerman,* the NYPD and EMT Defendants go to great lengths in their motion papers about facts relating to the male caller's contacts with Mizrahi that night and the male caller's discussions with the 911 operator.  *See, e.g.* NYPD Def. Mem. at 3-6; EMT Def. Mem. at 2.  Apparently the Defendants believe that this information is relevant because it shows that Mizrahi knew the male caller had called the police that night, saying she was "crazy."

While it may be correct that the male caller was known by Mizrahi, that is completely beside the point because it is undisputed that neither the NYPD nor the EMT Defendants knew anything about the identity of the male 911 caller.  The question is not whether Mizrahi believed that the male caller was reliable (she repeatedly said he was a liar).  The question is whether the officers responding to the call had any reliable information, and it is undisputed that the only "information" the officers had was that an unidentified male 911 caller was predicting that a female "friend" was going to try to hurt herself – a wholly conclusory and speculative statement devoid of facts or factual basis.   Since the reasonableness of their conduct depends on the information that they actually had at the time they took their actions, not information later learned after the fact,[24] the Defendants' arguments and contentions about the male caller's contacts that night with Mizrahi are irrelevant.  For similar reasons, any information that the 911 operator had based on the 911 operator's discussions with the male caller are not pertinent, unless that information was conveyed by the 911 operator to the officers at the scene.[25]

---

[23] *Id.* at 236.
[24] *Zellner v. Summerlin,* 494 F. 3d 344, 370 (2d Cir.2007).
[25] *United States v. Simmons*, 560 F.3d 98, 107 n.3 (2d Cir. 2009) ("There appears to have been

Accordingly, the motion for summary judgment on the entry claim based on probable cause and exigent circumstances should be denied.

*B. The Defendants Are Not Entitled To Qualified Immunity.*

The NYPD and EMT Defendants also seek summary judgment on the entry claim on qualified immunity grounds.  This part of their motions should also be denied.

The NYPD and the EMT Defendants are not entitled to summary judgment on qualified immunity grounds because there are disputed issues of fact about whether it was objectively reasonable to forcibly enter Mizrahi's home.  And the EMT Defendants are not entitled to raise a qualified immunity defense because they are non-governmental, private parties and the qualified immunity defense applies only to governmental officers engaged in discretionary functions of their public office.

As a general rule, police officers and other governmental actors are entitled to qualified immunity:  (1) if their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe that their acts did not violate those rights.[26] While the issue of whether a right was clearly established at the time is a question of law, whether an official's conduct was objectively reasonable (*i.e.,* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right) is a mixed question of law and fact.[27]

---

some information in the 911 call that was not communicated to the officers, including that the suspect had pointed a gun at the 911 caller. The parties agree, based on our decision in *United States v. Colon*, 250 F. 3d 130, 138 (2d Cir. 2001), that the investigative stop cannot be justified based on information that the 911 caller provided to the operator, but that was not communicated either to the dispatcher or to the investigating officers prior to the stop.")

[26] *Kerman*, 374 F 3d at 108.

[27] *Id.* at 109.

The contention that it was objectively reasonable for the Defendants to believe that their acts did not violate those rights "has its principal focus on the particular facts of the case."[28] When the facts are not in dispute, the Court can determine the issue of objective reasonableness as a matter of law, but "if there is such a dispute, the factual questions must be resolved by the factfinder."[29]

Here, the NYPD and EMT Defendants do not argue that Mizrahi's constitutional rights were unclear under the law.   Indeed, they cannot.  Instead, they argue that the facts demonstrate as a matter of law that their actions were objectively reasonable.

In the light of the *Kerman* decision, the Defendants are hard pressed to point to any facts that made it objectively reasonable for them to forcibly enter Mizrahi's home.  As noted above, *Kerman* held in 2001 that it is *unreasonable* as a matter of law to simply rely on an anonymous 911 call, and established Supreme Court law holds that a reasonably competent public official should know the law governing his conduct.[30]  Indeed, the Supreme Court in a leading qualified immunity decision stated that:  "the objective element of [qualified immunity] involves a presumptive knowledge of and respect for basic, unquestioned constitutional rights."[31]

Hence, the Defendants cannot under the law predicate their qualified immunity argument on the 911 call.  Instead, they argue that Chen and Corrado are entitled to qualified immunity on the grounds that Mizrahi "consented" to their entry.  (NYPD Def. Mem. at p. 19.)  As shown above, however, there is a disputed issue of fact about whether Mizrahi consented to their entry.

---

[28] *Id.* (quoting *Hurlman v. Rice*, 927 F. 2d 74, 78079 (2d Cir. 1991)).
[29] *Id.*
[30] *Harlow v. Fitzgerald*, 457 U. S. 800, 819 (1982).
[31] *Id.* at 814.

Accordingly, the qualified immunity issue cannot be resolved as a matter of law.[32]

In addition, the EMT Defendants are private parties.  As such, they are not entitled to invoke the qualified immunity defense as a matter of law because that immunity doctrine applies to public officials making discretionary judgments in the course of their official duties.[33] Accordingly, summary judgment on qualified immunity grounds should be denied because fact questions exist as to the objective reasonableness of the officers' actions and the defense is not

---

[32] *Kerman,* 261 F. 3d at 240 ("summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness"); *Zellner v. Summerlin*, 494 F. 3d 344, 367  (2d Cir. 2007) (lower court erred in granting police officers qualified immunity on issue of whether it was objectively reasonable to believe that plaintiff was engaging in disorderly conduct because jury found underlying facts after trial against defendants and lower court had to accept those facts as true); *Lozada v. Weilminoter*, 92 F. Supp. 76, 104 (E.D.N.Y. 2015) ("Taking the facts in the light most favorable to the Plaintiff, a reasonable jury could conclude that Trooper Nolan's actions were not objectively reasonable when he arrested and charged Plaintiff with disorderly conduct because of the fact that she was behaving in a calm and quiet manner."); *Tsesarskaya v. City of New York,* 843 F. Supp. 2d 446, 459 (S.D.N.Y. 2012) (summary judgment on qualified immunity grounds denied because a jury could find that the police officers did not have arguable probable cause to believe that the plaintiff was emotionally disturbed); *Bauer v. City of Hartford*, 2010 U. S. Dist. Lexis 115199 at *23-24 (D. Conn. Oct. 29, 2010) (summary judgment on qualified immunity grounds denied whether there was a question of fact as to whether it was objectively reasonable to conclude that the plaintiff consented to entry when the police banged on door for 40 minutes and threatened an arrest); *Ong v. Park Manor*, 2017 U.S. Dist. Lexis 164270 (S.D.N.Y. Sept. 28, 2017) (summary judgment on qualified immunity grounds denied where there was a question of fact about whether daughter had apparent authority to consent to search of father's bedroom or its contents).

[33] *B.D.S. v. Southold Union Free Sch. Dist.*, 2009 U.S. Dist. LEXIS 55981 at *51-52 (E.D.N.Y. June 24, 2009) (private party not permitted to raise qualified immunity defense because the policies underlying the qualified immunity defense are not implicated) (citing governing authorities, including *Richardson v. McKnight*, 521 U.S. 399, 404-412(1997) (refusing to extend the defense of qualified immunity to a private prison guard, notwithstanding that prison guards directly employed by the government may have enjoyed such immunity from suit); *Toussie v. Powell*, 323 F.3d 178, 183 (2d Cir. 2003) (holding that private defendants are not entitled to defense of qualified immunity with respect to Section 1983 claims); *Bender v. General Services Admin.*, 539 F.Supp.2d 702, 714 (S.D.N.Y. 2008) (citing circuit courts cases rejecting the extension of the qualified immunity defense to private parties operating under contract for the government); *Venable v. Keever*, 61 F.Supp.2d 552, 561-562 (N.D. Tex. 1999) (refusing to extend the defense of qualified immunity to attorney defendants who were employed as independent contractors to work for the school district)).

available as a matter of law to the EMT Defendants.

*II.  The Defendants Are Not Entitled to Summary Judgment*
*on the Illegal Seizure Claim.*

*A.  There Was No Basis to Seize Mizrahi.*

The NYPD Defendants and the EMT Defendants seek summary judgment on Mizrahi's

unlawful seizure and false imprisonment claims under the Fourth Amendment and New York

common law.  The motions should be denied because there are several factual issues that must be

resolved by a factfinder.

The elements of an illegal seizure claim under the Fourth Amendment and elements of a

false imprisonment claim under the common law of New York are similar.  Both require proof of

the following elements:  (1) the defendant intended to confine the plaintiff; (2) the plaintiff was

conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the

confinement was not otherwise privileged.[34]

The Defendants' motions for summary judgment are directed to the third and the fourth

elements.  They contend that the evidence conclusively establishes that Mizrahi consented to the

confinement and that there was probable cause to confine Mizrahi as a mentally ill and

dangerous person.[35]  As set forth below, there are disputed issues of material fact about whether

Mizrahi consented to the seizure and whether there was probable cause to believe that Mizrahi

was dangerous.

In the mental health seizure context, courts analyzing the privilege question first look to

---

[34] *Willey v. Kirkpatrick*, 801 F.3d 51, 70-71 (2d Cir. 2015) (New York common law); *Singer v. Fulton*, 63 F. 3d 110, 118 (2d Cir. 1995) (Section 1983 claims are substantially similar to the related common law claims of false arrest and false imprisonment).

[35] The burden of proof is on Mizrahi to show lack of consent whereas the burden of proof on the privilege issues is on the Defendants.  *See Allison v. New York*, 2011 U.S. Dist. LEXIS 109683 at

Section 9.41 of the Mental Hygiene Law, which gives police the authority to take a potentially

dangerous person to custody.  The statute provides in relevant part that:

> Any peace officer . . . may take into custody any person who appears to be mentally ill and is *conducting himself or herself in a manner* which is *likely to result in serious harm* to the person or others.

Mental Hygiene Law § 9.41 (emphasis added).

The Mental Hygiene Law also specifically defines the kind of conduct that can justify the

use of this police power.  The term "likely to result in serious harm" is expressly defined by the

statute to mean:

> (a) a *substantial risk* of physical harm to the person as *manifested by threats* of or *attempts* at suicide or serious bodily harm or *other conduct* demonstrating that the person is dangerous to himself or herself, or

> (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

Mental Hygiene Law § 9.01 (emphasis added).

Generally, a police officer's conduct is privileged under the Mental Hygiene Law where

it is objectively reasonable to conclude that there was probable cause to believe that the

individual was a danger to herself or others.[36]  Here, the Defendants do not point to any facts that

would lead a reasonable officer to believe that Mizrahi did anything before their entry to suggest

that she was a danger to herself.  As noted above, the *Kerman* decision holds that an anonymous

911 call by itself is not a sufficient basis to justify a warrantless entry.  Accordingly, the

Defendants cannot properly point to the 911 call as a basis for seizing Mizrahi.

---

*7 (W.D.N.Y. Sep. 25, 2011) ("Probable cause is an affirmative defense to a false arrest claim.")

[36] *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 456 (S.D.N.Y. 2012) ("Defendant' conduct is privileged where there was probable cause to believe that the individual was a danger to herself or others") (*citing Kerman v. City of New York*, 261 F. 3d 229, 240 n. 8 (2d Cir. 2001)).

Nor can the Defendants point to anything that Mizrahi did in the apartment that suggests that she engaged in any conduct or made any statements that reasonably suggested that she was dangerous to herself.  Indeed, based on the individual Defendants' admissions at their depositions that Mizrahi did nothing to suggest that she was dangerous, Mizrahi has moved for summary judgment on the issue of dangerousness.  Those same facts plainly demonstrate that the Defendants' motion on the dangerousness/privilege issue is meritless.

Finally, the Defendants are not entitled to summary judgment on the contention that the record demonstrates as a matter of law that Mizrahi "consented" to be taken to the hospital.  The audio recording of the events of August 10, 2015 and Mizrahi's deposition show that the four individual NYPD and EMT Defendants pushed their way into Mizrahi's apartment without permission and told Mizrahi in no uncertain terms that Mizrahi had to go with them to the hospital.  Within minutes of their forced entry, Nelson explicitly told Mizrahi that they could not and would not leave without her: "*Well, the fact that this is happening, **we can't leave you here.** That's why we're here.* This is, this is serious."[37]

Under the circumstances, a reasonable jury could easily find that Mizrahi had no other choice but to submit to the Defendants' demands that she go with them.  It was only after the four individual Defendants barged into her home, took control of the situation, and told Mizrahi that "we" can't leave you here, that Mizrahi said "take me" in the following exchange:

Nelson:      Who's here with you?
Mizrahi:     Nobody. I just have my dog.
Nelson:      You're here by yourself.
Mizrahi:     I mean, I have my dog, and if you wanna take me, take me. It's okay.[38]

---

[37] Audio Tape Tr. 2:48 (emphasis added); Addendum to Mizrahi Rule 56.1 Responsive Statement.
[38] *Id*. at 2:69-72.

Mizrahi made this statement soon *after* Nelson told her that "we can't leave you here." Mizrahi also made this statement only *after* Nelson asked Mizrahi if she wanted medical attention and Mizrahi refused medical attention, stating that she was fine.   The audio recording transcript, as confirmed by the deposition testimony, is clear on the point:

|  |  |
|---|---|
| Nelson: | Exactly, and I understand that also, but we, we're not sure what went on. [00:02:00] Do you understand me? So…. are you okay? |
| Mizrahi: | I'm fine. I'm very fine. |
| Nelson: | Are you sad? Do you need to talk to someone? |
| Mizrahi: | Oh, no. Just from the outcome, but I expected it. [39] |

At her deposition, Nelson admitted that Mizrahi's responses to these questions reflected the "possibility" that Mizrahi was refusing medical attention.[40]  At his deposition, Abeeluck admitted that this same exchange between Nelson and Mizrahi reflected that Mizrahi did not want to speak to any kind of medical person at the hospital.[41]  And Corrado agreed at his deposition that a patient does not have to utter any specific words in order to refuse medical attention.  All that a patient is required to say, according to Corrado, to refuse medical attention is that they do not want medical attention and that they are "fine."[42]

Even after Nelson told Mizrahi "get dressed," Mizrahi continued to resist, stating "why are you taking me now?"[43]  Nelson, who was not in the last bit deterred, flatly responded:

---

[39] Rule 56.1 Responsive Statement Addendum at 2:57-61.
[40] Nelson Tr. 80:5-83:2; Rad. Exh. H.
[41] Abeeluck Tr. 71:15-25 & 83:23-84:5; Rad. Exh. I. Abeeluck also admitted that Mizrahi told them at the apartment that she was "fine" and that in the section of his pre-care hospital report that he prepared and submitted to the hospital staff regarding the patient's chief complaint Abeeluck wrote "I'm fine" because that was what Mizrahi told him and that was the most appropriate response to the question about the patient's chief complaint.  *Id.*
[42] Corrado Tr. 44:17-20 & 46:20-24; Rad. Exh. K.
[43] Audio Recording Tr. 3:108; Rule 56.1 Addendum.

"Ma'am, we can't leave you here."[44]

The suggestion by the Defendants that Mizrahi manifested consent when asked to be taken to Maimonides is silly.  After being told repeatedly that she had no choice and after being told she was being taken to Coney Island Hospital, Mizrahi said imploringly "can you take me to Maimonides *at least*." [45]

Under these circumstances, the Defendants can only raise a weak factual question about whether Mizrahi voluntarily consented to go to the hospital.[46]  Indeed, a rational jury could easily find that Mizrahi surrendered to the Defendants in the face of their staunch show of authority, and that Mizrahi was never provided any genuine choice on the issue.

Fourth Amendment law does not require the Court to ignore the realities of the public's encounters with the police.  Established Supreme Court precedent holds that governmental officers have the burden of proving that the consent to waive a right was freely given.   "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."[47]  The "[o]rderly submission to law enforcement officers who in effect represent to the defendant that they had the authority to enter and search the house, against his will if necessary, was not such consent as constituting an understanding, intentional and voluntary waiver by the defendant of his fundamental rights under the Fourth Amendment to the Constitution."[48]

The "consent" that the NYPD and EMT Defendants press here ("take me") was not freely

---

[44] *Id.* at 3:109.

[45] *Id.* at 3:123 (emphasis added).

[46] "Consent is voluntary when it is a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Reyes*, 2012 U.S. Dist. LEXIS 14980 at *6 (S.D.N.Y. Feb. 1, 2012) (quoting *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir.1995)).

[47] *Bumper v. North Carolina,* 391 U. S. 543 (1968).

given – it was "granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right."[49]  When Nelson – who was backed up by two uniformed and armed male police officers -- told a 48 year old woman living alone that "we can't leave you here," they were in substance telling Mizrahi that she has no right to resist.  Simply put, the situation was "instinct with coercion." [50]  And "[w]here there is coercion there cannot be consent."[51]  Indeed, to accept the NYPD Defendants' suggestion that "consent" under these circumstances could exist "would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law and the police-state where they *are* the law."[52]

Settled summary judgment law requires the Court to disregard any evidence put forth by a movant that a reasonable jury would not have to accept.  Here, a jury would not be *required* to find that Mizrahi consented to go to the Maimonides psychiatric emergency room for a mental health evaluation, especially after telling the Defendants she did not want to see anybody, that she was fine, and that her "friend" was a liar.  Nor would a jury be required to find that Mizrahi consented to go to the hospital through the exercise of her own free will.  Mizrahi's statement "take me" reflects her submission to the assertion of their authority and her acceptance of the fact that she lacks the power to resist.

---

[48] *Id.* at 549 n. 14 (quoting *United States v. Elliot*, 210 F. Supp. 357, 360 (D. Mass. 1962)).
[49] *Johnson v. United States*, 333 U. S. 10, 13 (1948) (Jackson, J.).
[50] *Bumper, supra,* at 549.
[51] *Id.*
[52] *Johnson, supra*, at 17 (emphasis added).   In *Schneckloth v. Bustamonte,* 412 U. S. 218 (1992), the Supreme Court reaffirmed the holdings in *Bumper* and *Johnson* but also held that it was error for a trial court to require that the government prove that a criminal defendant had actual knowledge to reject a request to search a vehicle as a condition to finding that the consent was voluntary. "Voluntariness is a question of fact to be determined from all the circumstances and while the subject's knowledge of a right to refuse is a factor to be taken into account, the

Indeed, a jury ought to evaluate the Defendants' contentions on the consent issue for other important reasons.  On its face, the consent claim raises questions of fact about the Defendants' veracity and credibility.  On the one hand, the Defendants claim that Mizrahi was suffering from a mental illness and that she was potentially suicidal.[53]  At least, that is what the EMT Defendants told the staff at Maimonides.[54]   Yet at the same time, the EMT Defendants and the NYPD Defendants also contend that Mizrahi "consented" to be taken to the hospital for a psychiatric evaluation.

The Defendants' consent claims need to be heard and evaluated by a jury:

- A jury ought to hear the Defendants' explanations about how a potentially suicidal and mentally ill person could provide any kind of meaningful consent.[55]

- A jury ought to hear the EMT Defendants' explanation about why the pre-hospital care report that the EMT Defendants submitted to Maimonides does not mention *anything* about how Mizrahi "requested" or "consented" to be taken to the hospital for an evaluation.[56]

- A jury ought to hear Chen's explanation of how Mizrahi "consented" to be taken to the hospital when at the same time he also claimed at his deposition that the EMTs made the determination to take Mizrahi to the hospital.[57]

---

prosecution is not required to demonstrate knowledge as a prerequisite to establishing voluntary consent." *Id.* at 248-49.

[53] Pre-hospital Care Report ("PCR"); POX 2 at p. 1.

[54] *Id.*

[55] *Ruhlmann v. Ulster Cty. Dep't of Soc. Servs.*, 234 F. Supp. 2d 140, 173 (N.D.N.Y. 2002) ("[D]efendants are arguing that a mentally ill person gave an informed, voluntary, and intelligent consent while simultaneously contending, in effect, that plaintiff was not of sound mind and was unreasonably dangerous so as to warrant involuntary admission and treatment. Under any standard of informed consent a mentally ill person's capacity to consent, by definition, is questionable.")

[56] POX 2 (pre-care hospital report).

B.  *The Defendants Are Not Entitled to Qualified Immunity*
    *As a Matter of Law*

The NYPD and EMT Defendants also argue that they are entitled to summary judgment
on the seizure claim based on qualified immunity grounds.   As noted above, the EMT
Defendants are not entitled to assert qualified immunity because they are not public officers.
Thus, the Court should reject that defense as a matter of law.

Although the NYPD Defendants have a qualified immunity defense in theory, they are
not entitled to summary judgment on the issue.  To support their contention, the NYPD
Defendants argue that an objectively reasonable officer would have concluded that Mizrahi
consented to the seizure.  They also contend that an objectively reasonable officer would have
relied on the EMT determination that Mizrahi was an emotionally disturbed person.  (NYPD
Def. Mem. pp. 19-20).  Neither contention has any merit.

As demonstrated above, there are genuine issues of fact on the issue of whether it was
objectively reasonable to believe that Mizrahi consented to the seizure.  As such, summary
judgment is improper on that issue.[58]

Nor can the NYPD Defendants obtain summary judgment by contending that they
reasonably relied on the EMTs.  First, the Mental Hygiene Law and the Patrol Guide provide
rules for when a *police officer* can exercise the state police power to seize a mentally ill and
dangerous person.[59]  Nothing in the Mental Hygiene Law gives an EMT the authority to exercise
that power, and nothing in the Mental Hygiene Law authorizes the police to delegate that
authority to another party.  Since a reasonable police officer is presumed to know the law,[60] the

---

[57] Chen Tr. 65:17-23; Rad. Exh. J.
[58] *See n.* 32 *supra* (collecting cases).
[59] Mental Hygenie Law § 9:41; POX 3 (Patrol Guide 216-05) (PDX 2).
[60] *See* text accompanying footnotes 30-31 *supra*.

NYPD Defendants therefore cannot argue that they "reasonably relied" on an unauthorized EMS determination.  While it may be that a jury will determine that the authority was in fact delegated or shared, the law does not give a police officer the power to assign wholesale his duties to other non-public or private parties.  Hence, a jury could easily reject the suggestion that it was objectively reasonable for the NYPD Defendants to rely on the EMT Defendants. Importantly, the NYPD Defendants fail to come forward with any evidence that conclusively establishes that the New York City Police Department relies on private EMS persons in exercising these police powers.

Second, there is a disputed issue of fact about whether the EMT Defendants did in fact make the dangerousness determination on their own and without the collaboration and agreement of the NYPD Defendants.  Although Chen testified that EMS made the determination to take Mizrahi to the hospital as an EDP,[61] both Nelson and Abeeluck denied this contention, claiming that they are not qualified to make that determination.[62]   Thus, the EMT Defendants dispute the NYPD Defendants' contention that points the blame at the EMT Defendants.  Since the material facts are in dispute, a jury will have to make this determination about who made the determination to deem Mizrahi an EDP.

Third, the Court should reject the qualified immunity defense because it does not apply to the decisions made in this case.  Qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions."[63]  The qualified immunity doctrine exists "'to protect officials who are required to exercise their discretion'" to

---

[61] Chen Tr. 65:17-23; Rad. Exh. J.
[62] Nelson Tr. 48:7-50:5 (did not make determination and not qualified to do so) (Rad. Exh. H); Abeeluck Tr. 76:15-78:17 (same) (Rad. Exh. I).
[63] *Ying Jing Gan v. City of New York*, 996 F.2d 522, 531 (2d Cir. 1993) (emphasis added).

encourage "the vigorous exercise of official authority."[64]   Here, the Defendants' offer flatly

conflicting versions of the facts; the NYPD Defendants say the EMT Defendants deemed

Mizrahi an EDP and that they reasonably relied on the EMT's determination, whereas the EMT

Defendants, on the other hand, deny that they determined Mizrahi was an EDP and claim they

were not even qualified to make that determination.

Under these circumstances a reasonable jury could conclude that neither the NYPD nor

the EMT Defendants exercised any kind of *discretionary* judgment about Mizrahi and that they

simply went on automatic pilot and seized Mizrahi because the 911 call classified the job as an

EDP job.  In the event that the jury makes that factual determination, the Court should deny any

of the Defendants qualified immunity because the doctrine serves only to protect public officers

making discretionary, not ministerial or rote functions.[65]

For similar reasons, the claim that Chen and Corrado failed to intervene to protect

Mizrahi's constitutional rights cannot be dismissed as a matter of law.  Indeed, the facts -- even

when taken from the NYPD Defendants' point of view -- show that Chen and Corrado simply

stood by and let Nelson make the seizure decision, a decision that the law required that they

make and a decision that required the kind of respect for the Fourth Amendment rights that none

of the Defendants had.

### III.  There Are Disputed Issues of Fact On the Joint Action Issue.

The EMT Defendants argue that they cannot be held liable under Section 1983 because

---

[64] *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)).
[65] *See Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir. 1995) (citing *Harlow*, 457 U.S. at 816 (observing that qualified immunity is unavailable for ministerial tasks); *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (holding that qualified immunity doctrine applies where government official performs discretionary function, as distinct from ministerial function);

they claim that they were not acting under color of state law and were not state actors.  They are wrong.

As noted above, the EMT Defendants and the NYPD Defendants jointly responded to the 911 call.  When they eventually located Mizrahi's apartment, they rang the bell and announced themselves as the "police" and "EMS."[66]  Mizrahi unlocked her apartment door to see who it was, and the four individual Defendants, who were all in uniform wearing blue shirts with the emblems "NYP" or NYPD," pushed their way into the apartment.  Nelson and Chen both immediately ordered Mizrahi to put away her small beagle, who was barking at the intruders. After Mizrahi put the dog away, Nelson told Mizrahi that a "friend" called 911, saying that Mizrahi wanted to hurt herself.  Mizrahi told them that this "friend" was lying and that she had absolutely no intent to hurt herself.  Nevertheless, Nelson told Mizrahi that "this is serious" and that "*we* can't leave you here; that's why *we're* here" (emphasis added).[67]

Persisting further, Nelson asked Mizrahi if she needed to talk to someone, and Mizrahi told her "no" and that she was "fine."  Despite telling them that she was fine, Nelson exercised the NYPD's police power and directed Mizrahi to get dressed, stating:  "*we* can't leave you – especially by yourself" (emphasis added).[68]  Nelson also erroneously stated to Mizrahi that Mizrahi had to go to the hospital because she had to "prove *us* wrong [or] prove him [the male 911 caller] wrong."[69]

Mizrahi complied with Nelson's order to get dressed.  Chen then followed Mizrahi to her

---

*Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984) (discussing ministerial duty exception to qualified immunity).

[66] "EMS" is a reference to Emergency Medical Services whereas an "EMT" is reference to an Emergency Medical Technician.

[67] Audio Recording Tr. 2:48; Addendum to Rule 56.1 Responsive Statement.

[68] Audio Recording Tr. 2:57-61 & 3:109.

[69] Audio Recording Tr. 3:115.

bedroom door and directed Mizrahi not to lock the bedroom door and to leave the door slightly

ajar while Mizrahi went to her bedroom to change out of her pajamas and into street clothing.

While Mizrahi was in her bedroom, Chen stood guard at the threshold of Mizrahi's bedroom,

turning the knob of the bedroom door to make sure that Mizrahi had not locked the door to her

bedroom.[70]  To explain his behavior, Chen told his partner, Corrado, that he did not want to get

into a "barricaded EDP" situation.  Officer Corrado responded, "I know, fuck that."[71]

As explained by both Corrado and Chen at their depositions, an "EDP" is a reference to

an emotionally disturbed person and a "barricade EPD" refers to an emotionally disturbed person

who has locked himself or herself in a room or apartment and is refusing to leave or otherwise

cooperate with the police.  Hence, a reasonable jury could easily find that:  (a) Chen and Corrado

were treating Mizrahi as an EDP when she was told to go into her room to get dressed; (b)

Mizrahi was not free to remain home; and that (c) Chen and Corrado prevented her from locking

her door precisely because she was not free to remain in her home and had to go with them by

force or otherwise. [72]

After getting dressed, Mizrahi came out of her bedroom, and the NYPD Defendants and

EMT Defendants jointly escorted Mizrahi out of her building and into the NYP ambulance,

which was double-parked on the street.  The EMT Defendants then took Mizrahi to Maimonides

Hospital.

Under these circumstances, the EMT Defendants cannot establish as a matter of law that

---

[70] Mizrahi Tr. 174:8-23; Rad. Exh. G.
[71] Audio Recording Tr. 4:157.
[72] Corrado admitted that Mizrahi was not free to lock the door or to order them out of her apartment at that time.  (Corrado Tr. 55-57; Rad. Exh. K)  And Chen testified that he was not sure if Mizrahi was free to leave at that time, even though he admitted that he prevented Mizrahi from locking her bedroom door because he wanted to avoid a barricaded EDP situation.  (Chen Tr. 102-03; Rad. Exh. J.)

they were not acting in concert with the NYPD Defendants.  On November 24, 2015, the Court

held that Mizrahi stated a plausible claim under Section 1983 against the EMT Defendants.

(Amended Opinion & Order, DE # 7.)   The Court held that if the then-unidentified John Doe

officer identified in the complaint was a police officer, then Mizrahi could satisfy the state action

requirement for all three of the defendants who entered her apartment.[73]  (DE # 7 at p. 8.)

("Although both defendants Nelson and Abeeluck are private employees of New York

Presbyterian Hospital, a private actor may be a defendant in a § 1983 suit when he 'operates as a

willful participant in joint activity with the State or its agents.' ") (citing *Brentwood Academy v.*

*Tennessee Secondary School Athletic Ass'n,* 531 U. S. 288, 296 (2001) (quoting *Lugar v.*

*Edmondson Oil Co.*, 457 U. S. 922, 941 (1982)).[74]

      Since the pleading stage of this case, Mizrahi has marshaled extensive evidence (recited

above) about what happened in the apartment, showing the EMT Defendants and the NYPD

Defendants acted jointly in entering Mizrahi's home and in seizing her.  As reflected by the

audio recording, Nelson repeatedly referred to the four individuals and "we" or "us," a clear and

specific acknowledgment of joint and collaborative action.

      In addition, Chen and Corrado did not simply stand to one side, as suggested by the

---

[73] When she commenced this action, Mizrahi believed that only three individuals entered her apartment but the defendants' depositions confirmed that all four individual defendants (Nelson, Abeeluck, Chen and Corrado) entered her apartment.  Initially, counsel for the NYPD Defendants contended that no police officer entered Mizrahi's home.  Then, defense counsel contended that only Chen entered the home.  Finally, at the Corrado deposition it was determined that Corrado also entered Mizrahi's home.  *See* Mizrahi Rule 56.1 Responsive Statement # 66 at p. 19 n. 2.

[74] *See also Dennis v. Sparks*, 449 U. S. 24, 27-28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color of law' for purposes of Sec. 1983 actions."); *Addickes v. S.H. Kress & Co.,* 398 U. S. 144, 152 (1970) (state action can be established where a private employee and a local police officer reached an unlawful and tacit understanding to deny the plaintiff services in the private employer's store or to cause the plaintiff's subsequent arrest).

motion papers.  The recording shows that:  (a) Chen asked Mizrahi specific questions about her mental state ("are you sure?"); (b) Chen told Mizrahi to show Nelson her medicine bottle, (c) Corrado told Mizrahi that they "have to take this kind of call," (d) Chen and Corrdo treated Mizrahi as an EDP in her own home when Mizrahi went to her bedroom to get dressed; and (e) all four individual Defendants escorted Mizrahi out of her apartment and into the ambulance on the street.  Under these circumstances, the EMT Defendants cannot prevail on their argument that as a matter of law they were not state actors because there is ample evidence from which a reasonable jury could find that the EMT Defendants willfully participated in a joint action with the NYPD Defendants.

The NYPD and the EMT Defendants unwittingly provide the Court with an alternative basis upon which to find joint action.  In their papers, the NYPD Defendants claim that they delegated to the EMT Defendants their authority to deem Mizrahi an EDP.  (NYPD Def. Mem. pp. 7-8, 15 & 19-20.)  Similarly, the EMT Defendants argue that Chen and Corrado took no role in the EDP determination. (EMT Def. Mem. 7-10.)   As noted above, Mizrahi disputes these contentions and submits that the joint action issue cannot be resolved as a matter of law because there are disputed issues of fact and a jury would not be required to accept the defendants' self-serving attempts to run away from their role and responsibilities in this case.  Nevertheless, the EMT's position on their motion shows that they can also be state actors under the public function test as well as the joint action test.

The EMT Defendants in their memorandum of law admit that a private party can be a state actor when the private actor "has been delegated a public function by the State ('the public function test')." (EMT Def. Mem. at p. 6 (citing *Sybalski v. Independent Group Home Living Programs, Inc.,* 546 F. 3d 255, 257 (2d Cir. 2008)).   Since there is a factual question (as raised

by the EMT Defendants) about whether the NYPD Defendants delegated their police power to arrest to the EMT Defendants, the jury ought to determine, in the alternative, whether the public function test was satisfied by the NYPD Defendants' delegation of their police powers to the EMT Defendants.[75]

Finally, the cases cited by the EMT Defendants, *Fisk* and *Bang* (EMT Def. Mem. at 8), are not relevant.  Those cases stand for the proposition that a person who reports a crime to the police does not become a state actor merely by virtue of the fact that they have reported criminal activity.  Accordingly, those cases are not relevant to the joint action issue in this case.

*IV.  The Defendants Are Not Entitled to Summary Judgment*
*on the Common Law Claims.*

As noted above, Mizrahi has withdrawn her common law claims for (a) negligent misrepresentation, (b) negligent care and treatment, and (c) negligence.  On the other hand, however, Mizrahi maintains that there are genuine issues of material fact on her claims for intentional and negligent infliction of emotion distress and her claims for negligent training.

A.  *The Intentional and Negligent Infliction of Emotional Distress Claims.*

*1.  Intentional Infliction of Emotional Distress.*  The elements of the tort of intentional infliction of emotional distress are: (a) intentional or reckless conduct; (b) that is extreme and outrageous; (c) intended to cause, or disregard of a substantial probability of causing, severe emotional distress; (4) with a nexus between the conduct and the injury, and (5) severe emotional distress.[76]  The Defendants in their motions claim that Mizrahi cannot establish the extreme and

---

[75] *See, e.g. Jones v. County of Suffolk,* 164 F Supp. 3d 388, 396-97 (E.D.N.Y. 2016) (public function test satisfied for purposes of motion to dismiss based on allegations that private entity was delegated the public function of monitoring sex offenders when the private entity visited and questioned plaintiff at his home in violation of the Fourth Amendment).
[76] *Howell v. New York Post*, 81 N. Y. 2d 115, 121 (1993).

outrageous elements of this claim.  (EMT Def. Mem. at 19; NYPD Def. Mem. at 22.)[77]

Yet in *Kerman*, the Second Circuit held on similar facts that the plaintiff might be able to establish at trial the outrageousness elements of an intentional infliction of emotional distress claim.[78]   That holding ought to apply in this case as well:

The Defendants' conduct toward a 48-year old woman home alone in her apartment about to go to bed is fairly characterized as outrageous.  The Defendants' conduct consisted of the following:  they barged into her home; began ordering her about; ignored her statement that her "friend" was lying; ignored her statement that she was fine; ignored her statement that she did not want to see a doctor; insinuated (without any basis) that she was abusing medication with alcohol; used abusive curse words ("fuck that"); and forced her against her will to leave her apartment in the view of her neighbors and to be taken in an ambulance to an emergency room psychiatric ward late at night to "prove" that she was not suicidal.  Indeed, Nelson's tone and demeanor -- captured on the audio recording -- manifested utmost hostility toward Mizrahi and the sanctity of her home and privacy.   Finally, the EMT Defendants manufactured utterly false and inflammatory statements in their report to the hospital about Mizrahi (*i.e.*, the NYPD had to "clear the scene" and Mizrahi was "found walking around" her apartment) in order to justify their conduct.

We submit that a jury ought to hear this evidence and make a determination whether this assault on the integrity of a person and the sanctity of her home is so outrageous as to cross the

---

[77] The Defendants do not (and cannot) claim that Mizrahi lacks evidence of the severe emotional trauma that she suffered as a result of the Defendants' conduct on August 10, 2015.  In discovery, Mizrahi produced authorizations for such records, and substantial treatment records have been produced to the Defendants' counsel.  Since the Defendants do not challenge the common law claims on the absence of treatment for severe emotional trauma, we are not producing this evidence on these summary judgment motions, which Mizrahi intends to offer at trial through the testimony of her treating doctor, Dr. James Dean.

bounds of civilized society.[79]  Part of what makes and keeps our society civilized is that people

do have – at least in theory -- fundamental rights to be secure in their homes and in their person.

The Defendants' reliance on *Wright v. City of New York*, 2001 U. S. Dist. Lexis 8923

(S.D.N.Y. July 2, 2001) is wrong.  In that case, the lower court rejected the intentional infliction

claim in reliance on the District Court decision in *Kerman*, but as noted above, the Second

Circuit in its Kerman decision reversed that determination.  Hence, *Wright* has been undermined

by the Second Circuit on the outrageousness issue, a fact that further highlights our contention

that the outrageousness element of Mizrahi's intentional infliction claim has been satisfied.

2. *Negligent Infliction of Emotional Distress*. Mizrahi also submits that the negligent

infliction of emotional distress claim should go to the jury.   As a result of the Defendants'

conduct, Mizrahi suffered physical manifestations (rapid heart palpations and an elevated

respiration rate) and severe emotional distress, for which she has received extensive treatment.[80]

She also had reasonable grounds to fear that the doctors at the hospital would commit her to

psychiatric ward against her will, a particularly alarming threat to a woman living alone in New

York City.

"One to whom a duty of care is owed, it has been held, may recover for harm sustained

solely as a result of an initial, negligently-caused psychological trauma, but with ensuing psychic

---

[78] *Kerman*, 261 F. 3d at 244-45.

[79] *Cf. Sylvester v. City of New York,* 385 F.Supp.2d 431 (S.D.N.Y.2005) (conflicting testimony as to the circumstances surrounding the allegations that plaintiffs were forcibly brought to the police precinct, that officers ignored their requests to leave, and that officers elicited false statements, if resolved in the plaintiffs' favor, could be found to be "outrageous" and "extreme" by the fact finder).

[80] *See* n. 77 *supra*; *see also* Mizrahi Tr. 213:6-214:25 & 218:8-219:10 (Rad. Exh. G);  50-h Hearing Tr. 41:11-43:16 (Rad. Exh. L).

harm with residual physical manifestations."[81]  Provided that there are specific and special circumstances showing that the purely emotional injury is not contrived, the claim for negligent infliction of emotional trauma can be sustained.[82]  Those circumstances, we submit, have been satisfied here.

In addition, the claim for negligent infliction of emotional distress can be sustained where the plaintiff show evidences that the defendant breached a duty that unreasonably endangered plaintiff's physical safety.[83]  Here, Mizrahi testified that the Defendants' conduct in the apartment caused her to fear for her physical safety.[84]  Accordingly, the claim is sufficient on this ground as well.

B.  *The Negligent Training Claims*.

Finally, the negligent training claims should be submitted to the jury. Chen testified that he did not recall receiving any training on how to address an EDP situation,[85] and Corrado testified that even though the Patrol Guide states that the police officer at the scene makes the EDP determination, his practice is to always defer to EMS.[86]  Similarly, the two EMTs, Nelson and Abeeluck, testified that they are *not* qualified to make an EDP determination. [87]

---

[81] *Johnson v. State,* 37 N.Y. 2d 378, 381, 372 N.Y.S.2d 639, 642 (1975) (New York recognizes a cause of action on an negligent infliction claim where there is a likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious.)

[82] *Id.*

[83] *Baker v. Dorfman*, 239 F. 3d 415, 421 (2d Cir. 2000).

[84] Interrogatory Response No. 6(c) at pp. 11-12 (Radomisli Exh. N); Mizrahi Tr. 171:16-172:24 (Rad. Exh. G) (Mizrahi was scared for her safety because she felt trapped and Nelson was acting like bully and a thug).

[85] Chen Tr. 71:23-72:2: Rad Exh. J.

[86] Corrado Tr. 36:10-42:10; Rad. Exh. K.

[87] Nelson Tr. 48:7-50:5 (did not make determination and not qualified to do so) (Rad. Exh. H); Abeeluck Tr. 76:15-78:17 (same) (Rad. Exh. I).

Thus, based on the individual defendants' own admissions, their employers, the City of New York and New York and Presbyterian Hospital, failed to provide the training required for their employees to make the mental health assessment that the individuals Defendants collectively made when they deemed Mizrahi an EDP.  Mizrahi's theory is not that the employers had notice that those employees had any kind of propensity; the theory is that the employers failed to provide the basic training required to perform their duties and that that failure caused Mizrahi harm.  Since a reasonable jury could find that Mizrahi might not have been seized had the individual Defendants been properly trained on the requirements of this aspect of their respective functions, a valid claim against the employers for failure to train has been stated.[88]

Although the Defendants claim that the negligence claims are duplicative, that is not correct.  Mizrahi has withdrawn the general negligence claim, the negligent misrepresentation claim, and the negligent care and treatment claims.    The remaining claims for infliction of emotional distress and negligent training are not duplicative of these claims because each claim has different elements and raises different factual grounds for liability.[89]

---

[88] *See generally McCrink v. New York*, 296 N.Y. 99 (1947) (duty owed by employer is defined by the risk that could be reasonably foreseen that an employee might cause harm to a member of the public); *see also Detone v. Bullit Courier Serv., Inc*., 140 A.D.2d 278, 279, 528 N.Y.S.2d 575, 576 (1st Dept. 1988) ("The employer's negligence lies in his having placed the employee in a position to cause foreseeable harm, harm which would most probably have been spared the injured party had the employer taken reasonable care in making decisions respecting the hiring and retention of his employees.")

[89] *See, e.g., Sylvester v City of New York,* 385 F Supp. 2d 431, 443-44 (S.D.N.Y.2005) (intentional infliction claims and the false imprisonment claims not duplicative because enough elements of the intentional infliction claims do not fall under any of the plaintiffs' other tort causes of action) (citing *Wahhab v. City of New York,* 386 F.Supp.2d 277, 292-93, (S.D.N.Y.2005) (denying the defendants' motion for summary judgment on the plaintiffs' intentional infliction claim because the claim was not wholly duplicative of claims for assault and battery)).

*Conclusion*

Questions of fact predominate the multiple issues arising from the Defendants' motions for summary judgment.  Accordingly, the Court should deny the Defendants' motions for summary judgment.

Dated:  December 11, 2017

*s/NBS*
_____
Nathaniel B. Smith
225 Broadway – Suite 1901
New York, NY 10007
212-227-7062
natbsmith@gmail.com
Attorney for Plaintiff