UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
SHULAMIT MIZRAHI,                                                    :        15-CV-6084 (ARR) (LB)
                                                                     :
                          Plaintiff,                                 :
                                                                     :        OPINION & ORDER
          -against-                                                  :
                                                                     :        NOT FOR PUBLICATION
THE CITY OF NEW YORK, POLICE OFFICER JUN                             :
CHEN, POLICE OFFICER JOSEPH CORRADO, THE                             :
NEW YORK AND PRESBYTERIAN HOSPITAL (a/k/a :
NEW YORK PRESBYTERIAN HOSPITAL),                                     :
NOVLEEN NELSON, and SATISH ABEELUCK,                                 :
                                                                     :
                          Defendants.                                :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

        Plaintiff, Shulamit Mizrahi, brings this civil rights action under 42 U.S.C. § 1983 and New

York state common law against the City of New York, Police Officer Jun Chen, and Police

Officer Joseph Corrado (collectively, "City defendants") and New York Presbyterian Hospital

("NYPH"), Emergency Medical Technician (EMT) Novleen Nelson, and EMT Satish Abeeluck

(collectively, "EMT defendants") stemming from her interaction with the aforementioned police

officers and EMTs on August 10, 2015.[1] Plaintiff alleges that, on that date, the individual

defendants unlawfully entered her apartment, seized her, and took her to the hospital against her

will in violation of her Fourth Amendment rights. Plaintiff additionally asserts the following

state law causes of action: false imprisonment, intentional infliction of emotional distress

(IIED), negligent infliction of emotional distress (NIED), and, as against NYPH, negligent

---

[1] Unless I specify a particular group of defendants, "defendants" refers to both the EMT defendants and the City
defendants.

hiring, training, and supervision.[2] On January 5, 2018, defendants moved for summary judgment

on all of Mizrahi's claims. Mizrahi cross-moved for partial summary judgment, seeking a

determination that exigent circumstances did not justify the individual defendants' warrantless

entry into her apartment and that the individual defendants did not have probable cause to

confine and take her to the hospital against her will.[3]

For the reasons set forth below, defendants' motions are granted in part and denied in

part. Specifically, I deny the individual EMT defendants' motion for summary judgment on

plaintiff's unlawful entry and false arrest claims under § 1983, as well as plaintiff's state false

imprisonment claim. I also deny their motion for summary judgment on plaintiff's federal claims

based on qualified immunity, as their entitlement to qualified immunity under federal law is now

foreclosed. I grant their motion for summary judgment on plaintiff's remaining state law claims.

Furthermore, I deny NYPH's motion for summary judgment on plaintiff's state false

imprisonment claim but grant NYPH's motion as to plaintiff's other state law claims.

As to the City defendants, I deny the defendant police officers' motion for summary

judgment on plaintiff's unlawful entry, false arrest, and failure to intervene claims under § 1983,

as well as plaintiff's state false imprisonment claim. I grant their motion for summary judgment

---

[2] In her opposition to the defendants' motions for summary judgment, Mizrahi agreed to drop her negligent misrepresentation, negligent care and treatment, and general negligence claims. *See* Pl.'s Mem. of Law in Opp'n to Defs.' Mots. for Summ J. 2 ("Pl.'s Opp'n"), ECF No. 125.

[3] The City defendants argue that plaintiff's motion "is more properly construed as a motion to strike pursuant to Rule 12(f)" and is, therefore, untimely and should be denied. City Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Partial Summ. J. 22–23 ("City Defs.' Opp'n"), ECF No. 141-2. The City defendants are incorrect. "A party may move for summary judgment, identifying each claim *or defense*—or the part of each claim *or defense*—on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). The plain language of the rule clearly allows plaintiff to seek summary judgment on the City defendants' defenses. The 2010 amendments to the rule confirm this interpretation: "The first sentence [of Rule 56(a)] is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Civil Rules Advisory Committee, Notes on 2010 Amendment to Rule 56, Subdivision (a). Accordingly, I reject this argument and construe plaintiff's motion for partial summary judgment as what it is.

on plaintiff's remaining state law claims. I deny the City's motion for summary judgment on plaintiff's state false imprisonment claim but grant the City's motion as to plaintiff's other state law claims.

As to plaintiff, I grant her motion for partial summary judgment dismissing the individual defendants' defense of exigent circumstances for their allegedly unlawful entry into her apartment. I also grant her summary judgment on the defendant police officers' affirmative defense of qualified immunity on this basis. In addition, I grant plaintiff's motion for partial summary judgment dismissing the defendant police officers' defense of probable cause as to her false arrest claim. However, the defendant police officers' defense of qualified immunity on this claim remains open.

## BACKGROUND

The facts described below are taken from the parties' depositions, affidavits, exhibits, Rule 56.1 statements, and responsive Rule 56.1 statements.[4] The facts are undisputed unless otherwise noted. I draw "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in [the] materials . . . in the light most favorable to the party opposing the motion." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995).

On the evening of August 10, 2015, two police officers, defendants Chen and Corrado, and two EMTs, defendants Nelson and Abeeluck, responded to a 911 call from an unidentified

---

[4] *See* City Defs.' Stmt. of Undisputed Facts Pursuant to Local Civil R. 56.1 ("City Defs.' 56.1"), ECF No. 131; EMT Defs.' Stmt. of Undisputed Facts Pursuant to Local Civil R. 56.1 ("EMT Defs.' 56.1"), ECF No. 123; Pl.'s Stmt. of Undisputed Facts Pursuant to Local Civil R. 56.1 ("Pl.'s 56.1"), ECF No. 140-17; Pl.'s Counter Stmt. in Resp. to Defs.' Stmts. of Undisputed Facts Pursuant to Local Civil R. 56.1 ("Pl.'s Resp. 56.1"), ECF No. 126; EMT Defs.' Counter Stmt. in Resp. to Pl.'s Stmt. of Undisputed Facts Pursuant to Local Civil R. 56.1 ("EMT Defs.' Resp. 56.1"), ECF No. 127; City Defs.' Counter Stmt. in Resp. to Pl.'s Stmt. of Undisputed Facts Pursuant to Local Civil R. 56.1 ("City Defs.' Resp. 56.1"), ECF No. 141-1.

though self-described "friend" of the plaintiff's. Pl.'s 56.1 ¶ 9; City Defs.' Resp. 56.1 ¶ 9; EMT Defs.' Resp. 56.1 ¶ 9. The caller, later identified as Asher Adry, told the 911 dispatcher that he thought his "friend" was "going to hurt herself." Decl. of Cherie Brown in Supp. of City Defs.' Summ. J. Mot. ("Brown Decl."), Ex. I, Audio File 911MSG_01 at 00:13–00:17, ECF No. 130-9; City Defs.' 56.1 ¶ 7; Pl.'s Resp. 56.1 p. 4, ¶ 7. In that call, Adry informed the 911 operator that he had spoken with plaintiff a few minutes earlier. City Defs.' 56.1 ¶ 8. He provided the 911 operator with plaintiff's name—though he misspelled her last name—as well as a general description of plaintiff's address (the "old building" at "East 2nd Street and Avenue P"). Pl.'s 56.1 ¶ 10. He also stated that he thought plaintiff's apartment was "on the third floor . . . 3A or something like that" but, when asked for the plaintiff's exact address, responded "I have no idea." Brown Decl. Ex. I, at 00:40–01:15; City Defs.' 56.1 ¶ 12; Pl's Resp. 56.1 ¶ 12. Adry informed the operator that Mizrahi's name was on the door to the building and offered to meet the police there. City Defs.' 56.1 ¶¶ 13–14. When the 911 dispatcher asked if he believed plaintiff was "suicidal," Adry answered, "obviously yes." *Id.* ¶ 9.

At 8:43 PM, the 911 dispatcher assigned the job of responding to the 911 call to EMTs Nelson and Abeeluck, who were operating an ambulance at the time. *Id.* ¶ 18; EMT Defs.' 56.1 ¶ 6. The 911 dispatcher relayed to the individual EMT defendants the address Adry told her as well as the following information: an unidentified male caller said "friend trying to hurt herself" and "female patient 48[,] suicidal, location old building, possible [a]partment 3A." Decl. of Gregory J. Radomisli in Supp. of EMT Defs.' Summ J. Mot. ("Radomisli Decl."), Ex. H ("Nelson Dep."), at 141:6–142:18, ECF No. 121-8; Pl.'s Resp. 56.1 p. 6, ¶ 19. EMTs Nelson and Abeeluck proceeded to the location that the 911 dispatcher told them to go to but did not see anyone who was in need of assistance. City Defs.' 56.1 ¶ 21; EMT Defs.' 56.1 ¶ 6. EMTs Nelson

and Abeeluck called the 911 dispatcher and requested that he or she call back the person who made the initial 911 call to get more information. City Defs.' 56.1 ¶ 22. However, when 911 traced Adry's phone number and called him, the calls went to Adry's voicemail. *Id.* ¶ 23.

At approximately 8:45 PM, 911 dispatch relayed to Officers Chen and Corrado information similar to what the EMTs had received, including that the 911 caller was a male who stated that his friend was "trying to hurt herself." *Id.* ¶¶ 25–26. The two officers then arrived at the location where they were told to go but, after canvassing the intersection, observed no one in distress. *Id.* ¶¶ 28–29. Like the EMTs, they called 911 and asked for more information. *Id.* ¶ 27. Receiving none, Officers Chen and Corrado marked the job "unfounded" at 9:02 PM and proceeded to their next assignment. *Id.* ¶ 29; Radomisli Decl. Ex. J ("Chen Dep."), at 43:11–24, ECF No. 121-10.

Approximately thirty minutes after plaintiff and Adry spoke on the phone, Adry arrived at plaintiff's apartment. City Defs.' 56.1 ¶ 30; Pl.'s Resp. 56.1 p. 9, ¶ 30. Adry informed plaintiff that the police were coming and that he had told them that she was "crazy" and suicidal. EMT Defs.' 56.1 ¶¶ 8–9; Radomisli Decl. Ex. G ("Mizrahi Dep."), at 110:25–111:20, ECF No. 121-7. Plaintiff did not believe Adry and asked him to leave, which he did. City Defs.' 56.1 ¶ 32; Pl.'s Resp. 56.1 p. 9, ¶ 32.

At approximately 9:05 PM, a 911 operator called Adry for more information about plaintiff's address, and Adry provided plaintiff's correct apartment number. Brown Decl. Ex. M, Audio_74105 at 00:24–00:50; Pl.'s Resp. 56.1 p. 9, ¶ 33. The 911 operator relayed this information to EMTs Nelson and Abeeluck, and EMT Nelson responded that they needed plaintiff's exact address, not just the apartment number. Brown Decl. Ex. M, Audio_74107 at 00:10–00:19. The 911 operator again called Adry to ask for plaintiff's exact address and Adry

restated that it was "the old building" at the intersection of 2nd Street and Avenue P but that he did not know plaintiff's exact address. Brown Decl. Ex. M, Audio _74108 at 00:24–00:50. The 911 operator conveyed this information to the individual EMT defendants. *Id.* Audio_74109 at 00:05–00:30. After driving their ambulance around the vicinity of East 2nd Street and Avenue P, EMTs Nelson and Abeeluck located a building that matched the 911 caller's description at East 3rd Street and Avenue P. City Defs.' 56.1 ¶ 34. Upon seeing an apartment number that matched the one that the 911 caller had provided, EMT Nelson notified the dispatcher of the correct address and requested police presence. *Id.* ¶¶ 35–36.

Around twenty minutes later, 911 dispatch notified Officers Chen and Corrado that there was an emotionally disturbed person (EDP) at 1679 East 3rd Street, Apartment 302, and the two proceeded to that location. *Id.* ¶ 38. There is no indication that the officers knew that this call related to the earlier call about Mizrahi. *See* Chen Dep. 52:14–20. After the police officers arrived, one of the four defendants rang plaintiff's bell to gain entry into the apartment complex. City Defs.' 56.1 ¶ 39. Presumably over an intercom, plaintiff asked who was there and one of the officers answered, "Police." *Id.* ¶ 40. Plaintiff "buzzed them in," meaning that she unlocked the door electronically, allowing them entry into the building. *Id.* ¶ 41; EMT Defs.' 56.1 ¶ 12. The four defendants then proceeded to plaintiff's apartment on the third floor and Officer Chen knocked on her door. City Defs.' 56.1 ¶ 43; EMT Defs.' 56.1 ¶ 13. Plaintiff asked who was there, and Officer Chen stated, "Police," and EMT Nelson stated, "EMS." City Defs.' 56.1 ¶ 44; EMT Defs.' 56.1 ¶ 14. At some point before the individual defendants entered the apartment, plaintiff set up her cell phone to record the ensuing encounter. City Defs.' 56.1 ¶ 42.

The parties' characterizations of the individual defendants' entry into plaintiff's apartment differs. In her 56.1 statement, plaintiff asserts that the EMTs and police officers

"pushed their way into her apartment" and EMT Nelson "immediately started yelling orders at Mizrahi to put away her small beagle, who was barking . . . ." Pl.'s 56.1 ¶¶ 12–13. At her 50-h hearing, plaintiff described the individual defendants' actions as an "invasion" and a "kidnapping" but also said she "let them in . . . , I mind my own business and they open my door and take me." Radomisli Decl. Ex. L ("Mizrahi 50-h Tr."), at 51:16–24. When asked at her deposition whether she opened the door to her apartment "voluntarily to allow [the officers] in," Mizrahi Dep. 193:25–194:2, plaintiff responded, "Yes. I—can I—I didn't open. I unlock it. And then she pushed the door in." *Id.* at 194:3–6. She also said, "Ms. Nelson, she burst in with the two males. . . . So they basically barged in. She stormed in. I unlocked the door, but they stormed in." *Id.* at 293:21–24. According to the defendants, plaintiff opened her door and let them in without objection. EMT Defs.' 56.1 ¶ 15; City Defs.' 56.1 ¶¶ 45–46.

Once inside the apartment, EMT Nelson told Mizrahi that a "friend" called 911, saying that Mizrahi wanted to hurt herself. Pl.'s 56.1 ¶ 14; City Defs.' Resp. 56.1 ¶ 14. The plaintiff told EMT Nelson that she did not intend to hurt herself and indicated that this "friend," whom she assumed was Adry, was not a "true friend." Pl.'s 56.1 ¶ 15; Brown Decl. Ex. H, EMS081015 at 01:00–01:15. After plaintiff explained that she told Adry that she had been "down" but "nothing else," Brown Decl. Ex. H, at 01:19–01:25, EMT Nelson asked plaintiff about her medical history. *Id.* at 01:25. Plaintiff responded that she did not take medications and had no medical problems. *Id.* at 01:24–01:35. EMT Nelson then told Mizrahi that the situation was "serious" and that "we can't leave you here." Pl's 56.1 ¶ 16; Brown Decl. Ex. H, at 01:34–01:40. Plaintiff proceeded to tell EMT Nelson that Adry had been lying and that she was "fine, very fine." Brown Decl. Ex. H, at 01:45, 02:07. EMT Nelson asked if plaintiff was alone in her apartment,

to which plaintiff responded, "Nobody. . . . I mean, I have my dog, and if you wanna take me, take me. It's ok." *Id.* at 02:37–02:44.

EMT Nelson then asked plaintiff again whether she took any medications. *Id.* at 02:57. Mizrahi responded that she took Diazopam on an as-needed basis to help her sleep. *Id.* at 03:00. EMT Nelson and Officer Chen asked Mizrahi to show EMT Nelson the bottle. *Id.* at 03:04. After looking at the bottle, EMT Nelson said to plaintiff, "Ok baby, can you get dressed?"[5] to which plaintiff responded, "Yeah." *Id.* at 03:58–04:00. Plaintiff then asked, "Why you taking me now?" *Id.* at 04:02. EMT Nelson responded, "Ma'am, we can't leave you here, especially not by yourself." *Id.* at 04:03–04:06. Plaintiff repeated her question. *Id.* at 04:07. EMT Nelson responded that because of the call they received, "you can prove us wrong, prove him wrong" by going to the hospital. *Id.* at 04:17–04:24. After EMT Nelson and Officer Chen told plaintiff that they intended to take her to Coney Island Hospital because it was the closest hospital, plaintiff said, "Can you take me to Maimonides at least?" *Id.* at 04:30–04:32; *see* EMT Defs.' 56.1 ¶ 27. The defendants agreed. Brown Decl. Ex. H, at 04:32. EMT Nelson directed plaintiff to get dressed, and Officer Chen told her not to lock the door. *Id.* at 04:53–05:06. While plaintiff was changing, Officer Chen stated, "I'm not getting myself into a barricade situation" to which Officer Corrado responded, "I know. Fuck that." *Id.* at 05:26–05:30.

Once plaintiff was dressed, the officers, EMTs, and plaintiff left plaintiff's apartment, and plaintiff and the individual EMT defendants entered the ambulance. City Defs.' 56.1 ¶ 53; EMT Defs.' 56.1 ¶ 32. Officer Chen asked EMTs Nelson and Abeeluck if they needed a police escort, and they declined. City Defs.' 56.1 ¶ 55. The officers returned to their patrol car, *id.*, and

---

[5] Plaintiff argues that EMT Nelson directed her to get dressed, Pl.'s Resp. 56.1 ¶ 51, and defendants characterize the statement as a request, City Defs.' 56.1 ¶ 51.

EMTs Nelson and Abeeluck took Mizrahi in an ambulance to Maimonides Hospital. EMT Defs.' 56.1 ¶ 32; Pl.'s 56.1 ¶ 20. Mizrahi was released from Maimonides later that night. EMT Defs.' 56.1 ¶ 33; Pl.'s 56.1¶ 21.

On October 19, 2015, plaintiff filed a *pro se* action alleging numerous violations of her civil rights pursuant to 42 U.S.C. § 1983 and corresponding causes of action under New York law. *See* Compl., ECF No. 1. After I dismissed some of the alleged causes of action and granted plaintiff leave to amend her complaint, plaintiff, then represented by counsel, filed the operative complaint on November 4, 2016. Am. Compl., ECF No. 79. In the operative complaint, plaintiff alleged unlawful entry, arrest, and failure to intervene in violation of 42 U.S.C. § 1983 as well as false imprisonment, IIED, NIED, negligent misrepresentation, negligent care and treatment, negligent hiring, training and supervision, and negligence under New York law. *Id.* ¶¶ 51–98. The parties engaged in discovery. On January 5, 2018, the parties cross-moved for summary judgment; specifically, the defendants moved for summary judgment as to all of plaintiff's claims, and plaintiff moved for partial summary judgment as to the individual defendants' affirmative defenses. In her opposition papers, plaintiff agreed to drop the negligent misrepresentation, negligent care and treatment, and general negligence claims. *See* Pl.'s Opp'n 2. The others remain and the parties' motions are ripe for resolution.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (finding summary judgment proper only when "there can be but one reasonable

conclusion as to the verdict"); *Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."). If the movant satisfies the initial burden, the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is necessary because a disputed issue of fact exists. *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993). In attempting to defeat a motion for summary judgment, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)), *abrogated* on other grounds.

When evaluating the record to determine whether summary judgment is appropriate, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Therefore, if "there is *any* evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (emphasis added). Likewise, even where the evidence is undisputed, a court should not grant summary judgment if one could reasonably interpret the evidence in opposing ways. *See*

*Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 506 (S.D.N.Y. 2015); *see also Anderson*, 477 U.S. at 251–52 ("In essence . . . , the inquiry is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). At this procedural posture, the court's duty is "carefully limited" to "issue-finding," not "issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010) ("The role of the court in deciding a motion for summary judgment 'is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried . . . .'") (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986)).

Finally, when parties cross-move for summary judgment, the court examines each party's motion on its own merits and draws all inferences against the moving party. *See Morales v. Quintei Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Thus, summary judgment is proper only when reasonable minds could not differ as to the import of the evidence before the court. *See Straube v. Fla. Union Free Sch. Dist.*, 801 F. Supp. 1164, 1174 (S.D.N.Y. 1992).

## DISCUSSION

Plaintiff alleges three federal causes of action under 42 U.S.C. § 1983—warrantless entry, false arrest,[6] and failure to intervene—as well as four state law causes of action—false

---

[6] In the amended complaint, plaintiff alleges that the individual defendants violated her rights under the Fourth Amendment in three ways: "(i) by entering her home without a warrant and without exigent circumstances; (ii) by placing her in custody without any basis to believe that she was dangerous to herself or others; and (iii) by falsely arresting, imprisoning and taking Mizrahi to the hospital." Am. Compl. ¶ 56. Because the second and third alleged violations largely hinge on the same facts, and plaintiff, in her opposition brief, writes of only two violations—warrantless entry and illegal seizure—I analyze the second and third claims together. *See Lozada v. Weilminister*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) ("Because Plaintiff does not allege a search or seizure beyond the actions supporting her false arrest claim, Plaintiff's unlawful seizure claim is subsumed by her other Fourth Amendment claims.") (citing *Lastra v. Barnes & Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at *5 (S.D.N.Y. Jan. 3, 2012)). In addition, I refer to the claim as a false arrest claim, rather than a claim for illegal seizure. *See Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) (explaining that the "infringement" on liberty associated with being involuntarily confined is "tantamount to the infringement of being arrested"). As further explained below, a mental health seizure must be supported by probable cause. That being so, it is more appropriate to consider plaintiff's claim as

imprisonment, IIED, NIED, and negligent hiring, training, and supervision. Defendants seek summary judgment on all claims.[7] Plaintiff seeks summary judgment on the individual defendants' affirmative defenses. I will address each claim separately and distinguish between the defendants where relevant.

## I.   Federal Claims

### A.  EMTs Nelson and Abeeluck – State Action

EMTs Nelson and Abeeluck move to dismiss plaintiff's federal claims on the ground that they cannot be held liable under 42 U.S.C. § 1983 because they were neither state actors nor private parties acting under color of state law during their interactions with Mizrahi. *See* EMT Defs.' Mem. of Law 4–5, 8. Plaintiff opposes the individual EMT defendants' motion, arguing that EMTs Nelson and Abeeluck were state actors under the "joint action" test because they acted jointly with the police officers when they entered Mizrahi's apartment and confined her. *See* Pl.'s Opp'n 22–27. Plaintiff also asserts that the individual EMT defendants were state actors under the "public function" test. *Id.* at 26. Although I conclude that EMTs Nelson and Abeeluck were not state actors under the "public function" test, there are disputed issues of fact

---

one for false arrest, rather than for illegal seizure, which could erroneously suggest that the individual defendants needed only reasonable suspicion to detain the plaintiff. *See Posr v. Doherty*, 944 F.2d 91, 96–99 (2d Cir. 1991). Moreover, all of the parties rely on New York law pertaining to false arrest and false imprisonment to delineate the standard that they believe the court should apply to its Fourth Amendment analysis, regardless of whether that party refers to the Fourth Amendment claim as being for an "illegal seizure," *see* Pl.'s Opp'n 13, or a "false arrest," *see, e.g.*, EMT Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. 5 ("EMT Defs.' Mem. of Law"), ECF No. 122.

[7] City defendants also argue that I should dismiss Officer Corrado from this action for lack of personal involvement. *See* City Defs.' Mem. of Law 9 n.3, 16 n.5. According to the City defendants, plaintiff's amended complaint indicates that Officer Corrado never entered plaintiff's apartment, so he cannot be held liable for either unlawful entry or false arrest. *Id.* As plaintiff argues, however, it is now undisputed that Officer Corrado entered plaintiff's apartment, spoke to the plaintiff inside the apartment, and engaged with the other defendants regarding plaintiff's alleged confinement. *See* Pl.'s Resp. 56.1 ¶ 66; Radomisli Decl. Ex. K ("Corrado Dep."), at 59:24–60:4, 30:24 –31:2; 51:22–52:6, ECF No. 121-11. In light of this evidence, I deny the City defendants' request to dismiss Officer Corrado from this action for lack of personal involvement.

as to whether they were state actors under the "joint action" test. I therefore deny their motion for summary judgment on this basis.

To prevail on a federal civil rights action under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress from the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

As a general matter, private citizens and entities are not subject to Section 1983 liability. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999); *Ciambriello v. Cnty. Of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002). Nevertheless, the conduct of a nominally private actor can be attributed to the state when "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)). Under all of these tests, the plaintiff bears the burden of proof and must demonstrate that the state was involved "with the activity that caused the injury" giving rise to the action. *See id.* at 257–58. Determining whether a private party qualifies as a state actor is a "fact-specific inquiry," *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995), and there is no "'simple line' that can be used to delineate what is, or what is not, state action," *Forbes v. City of N.Y.*, No. 05-CV-7331 (NRB), 2008 WL 3539936, at *4 (S.D.N.Y. Aug. 12, 2008) (quoting *Brentwood*, 531 U.S. at 295);

*see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.").

In the instant case, it is undisputed that NYPH and its volunteer EMTs are private parties. *See* Pl.'s Resp. 56.1 p. 20, ¶ 3. The question, therefore, is whether EMTs Nelson and Abeeluck were acting under color of state law when they allegedly entered plaintiff's apartment, confined her, and took her to the hospital. The two tests at issue here are the joint action and public function tests. *See* EMT Defs.' Mem of Law 6; Pl.'s Opp'n 22–27.

###### i. Joint Action Test

Under the "joint action" test, a private actor can be found "to act under the color of state law for § 1983 purposes if . . . [the private party] is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). To establish joint action, a plaintiff must show that the private citizen and the state official "shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." *Anilao v. Spota*, 774 F. Supp. 2d 458, 498 (E.D.N.Y. 2011) (quoting *Bang v. Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996)). The plaintiff must demonstrate that "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (quoting *Brentwood*, 531 U.S. at 295). While "[t]he touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom or policy' shared by the private actor and the police," *Forbes*, 2008 WL 3539936, at *5 (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir. 1999)), courts

have recognized that state action can occur through "winks and nods," *Brentwood*, 531 U.S. at 301.

When analyzing allegations of state action, a court begins by identifying "the specific conduct of which the plaintiff complains." *Grogan*, 768 F.3d at 264. Here, plaintiff argues that the individual EMT and City defendants jointly entered her apartment, acted together to confine her in the apartment, and jointly escorted her out of her building to the ambulance.

Viewing the evidence in the light most favorable to the plaintiff, I conclude that summary judgment declaring that EMTs Nelson and Abeeluck were not state actors as a matter of law is not appropriate. The record demonstrates that the EMTs and the police officers announced themselves together at plaintiff's door. *See* Pl.'s Resp. 56.1 pp. 11-12, ¶¶ 43–46. After entering the apartment together, both EMT Nelson and Police Officer Chen spoke to plaintiff and directed her to perform certain acts, such as to show EMT Nelson her medication. *See* Brown Decl. Ex. H, at 03:04. In addition, EMT Nelson stated, "we can't leave you here," a sentiment that is, as the EMT defendants acknowledge, ambiguous as to whether it referred to only the two EMTs or to the defendant police officers as well. *See* EMT Defs.' Reply Mem. 4 (noting that plaintiff's counsel never asked EMT Nelson whether her use of the word "we" included the police officers as well, thus implicitly acknowledging that its meaning remains ambiguous). The four individual defendants also escorted Mizrahi out of her building and into the ambulance together. From these facts, a reasonable juror could conclude that the individual EMT defendants were "willful participant[s] in joint action with the State or its agents." *Dennis*, 449 U.S. at 27.

EMTs Nelson and Abeeluck offer a number of arguments to support their contention that they do not qualify as state actors under the joint action test. First, they argue that they

cannot be considered state actors because "the police officers did not play any role in plaintiff's confinement or in the decision to take plaintiff to the hospital." EMT Defs.' Mem. of Law 8. According to the individual EMT defendants, therefore, they did not act jointly with the police in deciding to hospitalize plaintiff and, thus, cannot be said to have acted under color of state law.

Plaintiff, however, strongly disputes this assertion and does so with reason. *See* Pl.'s Opp'n 22–26. Officer Chen stood outside of plaintiff's bedroom while she changed from her pajamas into street clothing and would not allow Mizrahi to lock her door. *See* Brown Decl. Ex. H, at 05:06. As Officer Corrado acknowledged, such an action reasonably could indicate to plaintiff that she was not permitted to leave. *See* Corrado Dep. 55:15–23. Indeed, a reasonable juror could interpret such an action as "participat[ing] in [the individual EMT] defendants' actions that caused the injury." *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 917 F. Supp. 2d 283, 288 (S.D.N.Y. 2013). To explain his behavior, Officer Chen told Officer Corrado that he did not want to get into a "barricade" situation, to which Officer Corrado responded, "I know. Fuck that." Brown Decl. Ex. H, at 05:26–05:30.

Moreover, even if the individual EMT defendants were "in charge" of the situation, EMT Defs.' Mem. of Law 8, that does not necessarily mean that the police officers played *no* role in confining the plaintiff and, therefore, that EMTs Nelson and Abeeluck were not acting under the color of state law. *See Anilao*, 774 F. Supp. 2d at 499 ("When the private actor takes a more active role . . . and jointly engages in action with state actors, he will be found to be a state actor.") (citing *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 942 (1982)). Courts have differentiated between cases where a private party simply supplies information to the police or seeks police assistance and those where private parties actively engage with police to achieve

desired ends. *Compare Newman v. Bloomingdale's*, 543 F. Supp. 1029, 1032 (S.D.N.Y. 1982) (finding no state action where police responded to reports of shoplifting and "nothing in the record . . . show[ed] that the police were influenced in their choice of procedures by [the private actors] . . . or that [the private actors] had any control over what procedures the police followed") *with Bacquie v. City of New York*, No. 99CIV.10951 (JSM), 2000 WL 1051904, at *2 (S.D.N.Y. July 31, 2000) (denying a motion to dismiss on state action grounds because the defendants, hotel employees, "did more than just call the police and swear out a complaint" and could, therefore, be held liable as state actors). *Cf Shapiro v. City of Glen Cove*, 236 F. App'x 645, 647 (2d. Cir 2007) (finding no state action where the evidence demonstrated that the public officials "exercised independent judgment rather than act[ed] at [the private entity's] direction"). Indeed, the individual EMT defendants' self-proclaimed leadership role in the incident may work against them. *Cf. Schoolcraft*, 103 F. Supp. 3d at 532 (finding that EMTs were not state actors because the evidence "unambiguously" demonstrated that the police officer, and not the EMTs, declared the plaintiff an EDP).

The individual EMT defendants also argue that "[t]he absence of any evidence that there was communication between the police officers and the EMTs is key" because, without this evidence, "a concerted effort or plan cannot exist." EMT Defs.' Mem. of Law 8. As stated earlier, however, the absence of an explicit conversation about depriving plaintiff of her rights is not dispositive of whether there was joint action. *See Adickes v. Kress & Co.*, 398 U.S. 144, 153–54, 157–58 (1970) (noting that a "meeting of the minds" and a "tacit" agreement to violate plaintiff's rights could suffice to establish state action). This is not a situation where the EMTs and police officers disagreed about how to proceed or where either the police or the EMTs acted under protest. *See Hollman v. Cty. of Suffolk*, No. 06-CV-3589 JFB ARL, 2011 WL 2446428,

at *8 (E.D.N.Y. June 15, 2011) (finding no state action where it was uncontested that the paramedic defendants "did not *willingly* participate" with the defendant police officers in denying the plaintiff medical treatment). As such, a reasonable juror could find that the individual defendants acted jointly when allegedly confining the plaintiff even if they did not explicitly converse about their intention to deprive plaintiff of her rights.

Finally, the EMT defendants' argument that Officer Chen's "[t]elling the plaintiff she could not lock her door in order to avoid getting into a barricaded EDP situation is not evidence of joint action between the police and the EMTs" is unpersuasive. EMT Defs.' Reply Mem. 4. EMT defendants offer no case law or reasoning to support their assertion that I should effectively ignore this—or any other—fact. I decline to do so.

For these reasons, I find that plaintiff has carried her burden and that EMTs Nelson and Abeeluck cannot show that they were not state actors as a matter of law under the joint action theory. I therefore deny their motion for summary judgment on this ground.

### ii. Public Function Test

By contrast, EMTs Nelson and Abeeluck are correct that they are not state actors under the public function test. Under this test, "[s]tate action may be found in situations where an activity that has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity." *Grogan*, 768 F.3d at 264–65; *Sybalski*, 546 F.3d at 259 ("[P]rivate actors must be delegated functions that were traditionally under the exclusive authority of the state for the public function test to be satisfied."). The test focuses specifically on whether the activity historically has been "the exclusive prerogative of the sovereign," not on whether governments often assume the responsibility at issue. *Grogan*, 768 F.3d at 265 (collecting cases where courts have found state action, such as in the contexts of medical care for prison inmates, holding

primary elections, and operation of a post office). As the Second Circuit conclusively held in *Grogan*, "the provision of emergency medical care and general ambulance services . . . cannot be said [to constitute] 'traditionally exclusive public function[s].'" *Id.* Therefore, plaintiff has not proven that the individual EMT defendants are state actors under the public function test and she cannot make this argument at trial.

### B. Unlawful Entry

Turning to the heart of this case, the individual EMT and City defendants argue that plaintiff's unlawful entry claim fails as a matter of law because plaintiff consented to the entry or, in the alternative, they had probable cause to enter plaintiff's apartment without a warrant based on the existence of exigent circumstances. *See* City Defs.' Mem. of Law 8–12; EMT Defs.' Mem. of Law 13–17. Plaintiff argues that there are disputed issues of material fact precluding summary judgment on the defendants' defense of consent to entry but argues that the record is undisputed that no exigent circumstances existed. *See* Pl.'s Opp'n 3–10. I agree with plaintiff and, thus, deny the individual defendants' motions for summary judgment on plaintiff's unlawful entry claim on the basis of consent and grant plaintiff's motion for summary judgment on their defense of exigent circumstances.

A warrantless entry into one's home is presumptively unreasonable. *See Payton v. New York*, 445 U.S. 573, 586 (1980). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." *Id.* at 590. Nevertheless, as "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). First, a warrantless entry may be justified on the ground of consent because "it is no doubt reasonable for the police to [enter] once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). Second, law enforcement may be justified in

entering one's home without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). Because the defendants invoke both exceptions, I address each in turn.

### i.    Consent

Under the Fourth Amendment's consent exception "warrantless entry . . . [is] permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent." *United States v. Guerrero*, 813 F.3d 462, 467 (2d Cir. 2016) (quoting *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995)). To determine whether consent is valid, courts examine the "totality of the circumstances" and assess whether the consent was "a product of that individual's free and unconstrained choice . . . rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). If an individual's consent is "coerced, by explicit or implicit means, by implied threat or covert force," it is invalid. *Guerrero*, 813 F.3d at 467 (quoting *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006)). The standard for measuring the scope of consent is "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. Although "consent need not be express but may be implied from 'an individual's words, acts or conduct,'" *Seifert v. Rivera*, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) (quoting *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988)), the government bears the burden of proving that the consent was voluntary, *see Schneckloth*, 412 U.S. at 223; *see also U.S. v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004).

Viewing the facts in the light most favorable to Mizrahi, the record does not permit an inference that, as a matter of law, she consented to the individual defendants' entry into her apartment. First, there is conflicting evidence as to whether plaintiff opened the door or she

simply unlocked it, after which one or more of the individual defendants pushed it open. While it is true that plaintiff herself offered varying accounts of what happened, her descriptions of what occurred are not so incongruous so as to constitute a "sham issue of fact." City Defs.' Mem of Law 9 n.4; *see also* City Defs.' Reply Mem. 5–7. For example, at her 50-h hearing, Mizrahi said that the defendants knocked on the door and she "let them in" but she made this statement in the context of describing the defendants' entry as an "invasion": "[Y]es, they knocked on the door, I let them in, but I mean, maybe for lack of a better word, I'm using 'invasion' . . . , I mind my own business and *they open my door and take me*; you can call it whatever you want. Kidnapping? Maybe, yeah, 'kidnapping' is better." Mizrahi 50-h Tr. 51:17–24 (emphasis added).[8] Contrary to defendants' assertions, therefore, plaintiff's 50-h hearing testimony is not wholly at odds with her later deposition testimony that she unlocked the door "and then [EMT Nelson] pushed the door in." Mizrahi Dep. 194:5–6. I will not, as the defendant police officers ask me to, *see* City Defs.' Mem. of Law 9, disregard plaintiff's sworn testimony that the EMTs and police officers "barged in" to her apartment or, as she said multiple times, that they "stormed into the hallway" of her apartment, Mizrahi Dep. 293:23–24. To the extent that there are inconsistencies in plaintiff's testimony, it is for a jury to determine whom and what to believe. *See Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

---

[8] I also note that plaintiff repudiated the accuracy of the 50-h transcript at her deposition. *See* Mizrahi Dep. 29:3–19.

Moreover, even if it were "undisputed that plaintiff opened her door," City Defs.' Reply Mem. 4, such an action is not dispositive of consent to entry. *See Kentucky v. King*, 563 U.S. 452, 469–70 (2011) ("[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."). In *United States v. Reed*, federal agents knocked on a suspect's door and, after she opened it, entered her home and arrested her. 572 F.2d 412, 423 (2d Cir. 1978); *see also U.S. v. Allen*, 813 F.3d 76, 85 (2d Cir. 2016) (upholding *United States v. Reed*). In a footnote, the Second Circuit noted with approval the government's decision not to argue that the defendant had consented to the entry. "We do not believe that the fact that Reed opened the door to her apartment in response to the knock of three armed federal agents operated in such a way as to eradicate her Fourth Amendment privacy interest." *Reed*, 572 F.2d at 423 n.9. The court continued, "[t]o hold otherwise would be to present occupants with an unfair dilemma, to say the least[,] either open the door and thereby forfeit cherished privacy interests or refuse to open the door and thereby run the risk of creating the appearance of an 'exigency' sufficient to justify a forcible entry." *Id.* Particularly appropriate here, the Second Circuit added that posing such a dilemma to occupants "would hardly seem fair in situations that present no exigent circumstances in the first place." *Id.*; *see also Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 248 (E.D.N.Y. 2005) (acknowledging that a "great dispute" exists among the federal courts about whether opening one's door in response to a police officer's knock constitutes a surrender of one's privacy interests but concluding, based on Second Circuit precedent, that "[i]t cannot be said as a matter of law that plaintiff abandoned her privacy interest simply by opening the door to her home in response to the defendants' knock").

The EMT defendants argue that the instant case is distinguishable because, here, plaintiff "knew in advance" that the police and EMTs were coming based on Adry's warning that they had been summoned and because the plaintiff allowed the defendants entry into her building when she "buzzed them in" in the first place. EMT Defs.' Mem. of Law 2, 17. According to the EMT defendants, therefore, there is more evidence here to indicate consent than "simply . . . the plaintiff open[ing] the door to her apartment in response to a knock." *Id.* at 17. However, Mizrahi specifically testified that she did not believe Adry when he told her that the police were coming. *See* City Defs.' 56.1 ¶ 32. Even if she did and was thus "on notice" that the EMTs and police officers would arrive imminently, the fact that she allowed the four defendants to enter her building—a common space—does not mean that she consented to their entering her apartment.[9] Unlike other cases where courts have found consent as a matter of law, there is no evidence here that plaintiff waved the parties into her home, *see, e.g.*, *Kaminsky v. Schriro*, 243 F. Supp. 3d 221, 228 (D. Conn. 2017), or that she stepped back to allow the defendants to enter, *see Seifert*, 933 F. Supp. 2d at 316. There is also no evidence that the defendant EMTs or police officers asked if they could enter Mizrahi's apartment and that Mizrahi said yes. *See United States*

---

[9] Although the standard is objective, I note that the EMT defendants' contention that plaintiff "cannot legitimately argue that she allowed the defendants into her building without expecting them to then knock at her door to go into her apartment," EMT Defs.' Reply Mem. 10, is belied by plaintiff's statement about her intentions:

> Q. When you unlocked the door, was it your intention to invite the people on the other side of the door into your apartment?
> . . .
> A. Absolutely not.
> Q. What was your intention?
> A. To discuss with them and clarify and—you know, I thought it's going to take a second for me to clarify from the door, looking at them, and telling them, "everything is fine. Thank you. Have a lovely evening." That was my—my thought, that it's going to be one, two three, and then I'll go to—you know, because I wanted to go to sleep. I was tired.

Mizrahi Dep. 294:17–295:10. More importantly, it is well-established that one can limit the scope of one's consent. *See Jimeno*, 500 U.S. at 252.

*v. Guzman*, No. 13-CR-6118, 2015 WL 774211, at \*9 (W.D.N.Y. Feb. 24, 2015); *see also U.S. v. Bartee*, No. 13 CR. 365 RJS, 2013 WL 6164339, at \*9 (S.D.N.Y. Nov. 12, 2013) (finding that consent was voluntarily given where "the record [was] clear that the police asked Davis for her permission to go down from the hallway at the top of the stairs into her apartment . . . ; they did not invite themselves in or simply walk into her apartment without her permission"); *cf. United States v. Taylor*, 279 F. Supp. 2d 242, 245 (S.D.N.Y. 2003) (holding that the government failed to satisfy its burden of proving consent to search where the officer "asked Taylor if he could search the apartment [and] Taylor did not say yes, nod, or otherwise assent affirmatively").

The EMT defendants also argue that plaintiff's "deci[sion] to record the encounter even before they entered the apartment" indicates her consent to entry. EMT Defs. Reply Mem. 10. A reasonable jury, however, could find that it indicates the opposite—that plaintiff set up her phone to record *in case* the officers and the EMTs acted contrary to her wishes and in violation of her rights, as she now argues that they did. The fact that plaintiff did not specifically say that she was "opening her door 'under protest,'" *id.*, or otherwise verbalize objection to the individual defendants' actions is certainly a fact that defendants may argue at trial but it does not prove as a matter of law that plaintiff voluntarily allowed the officers and EMTs into her home.

Finally, the audio recording that each party argues lends support to its respective position does not resolve the question of whether the plaintiff consented to the individual defendants' entry. *See* City Defs.' Reply Mem. 4; *see also Schoolcraft*, 103 F. Supp. 3d at 506 ("[T]he recordings do not contain video so that evaluation of [plaintiff's] demeanor following the NYPD's warrantless entry is at issue."). From the recording, it is impossible to tell how the door was opened. The City defendants' argument that the entry "happened so unremarkably that it is not possible to tell [from the tape] at which point(s) each defendant ventured inside the apartment"

does not actually help their cause. City Defs.' Reply Mem. 4. Assuming all inferences in favor of the plaintiff, as I must, it is possible that Mizrahi unlocked the door from the inside and the officers and EMTs pushed the door open and entered before she could stop them. If found true, the fact that Mizrahi did not shout "no" as the individual defendants crossed the threshold into her apartment does not mean that she consented to their entering.

Because a genuine issue of fact exists as to whether plaintiff consented to the individual defendants' entry into her apartment, defendants' motions for summary judgment as to plaintiff's illegal entry claim on the basis of consent are denied.

### ii.    Exigent Circumstances

Defendants next argue that even if plaintiff had not consented to the individual defendants' entering her apartment, the entry was lawful because the EMTs and police officers reasonably believed that plaintiff posed a danger to herself based upon the information conveyed in the 911 call.[10] City Defs.' Mem. of Law 10–12; EMT Defs.' Mem. of Law 13–15. Plaintiff argues that the 911 call was not reliable and, thus, cannot serve as the basis for a finding of exigent circumstances under *Kerman v. City of New York*, 261 F.3d 229 (2d Cir. 2001). Pl.'s Opp'n at 3–10. Plaintiff seeks summary judgment on this theory. *See* Pl.'s Mem. of Law 8–9.

Police officers may enter someone's home without a warrant "to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Tierney v. Davison*, 133 F.3d 189, 196 (2d Cir. 1998) (quoting *Root v. Gauper,* 438 F.2d 361, 364 (8th Cir. 1971)). The "essential question" is whether the police had an "'urgent need' to render aid or take action." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc)

---

[10] Plaintiff contends that only the City defendants make this argument. *See* Pl.'s Mem. of Law in Supp. of Her Mot. for Partial Summ. J. 1 ("Pl's Mem. of Law"), ECF No. 139. However, the EMT defendants also argue that exigent circumstances justified their entry. *See* EMT Defs.' Mem. of Law 13–15.

(quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970)). "In answering that question, we must be cognizant of the Supreme Court's admonition that 'exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.'" *Loria v. Gorman*, 306 F.3d 1271, 1284-85 (2d Cir. 2002) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)).

Exigent circumstances arise when police officers have probable cause to believe "a person is in 'danger.'" *Kerman*, 261 F.3d at 236 (quoting *Tierney*, 133 F.3d at 196–97). The mere "possibility" of danger, however, is not sufficient to justify a warrantless entry. *Hurlman v. Rice*, 927 F.2d 74, 81 (2d Cir. 1991). Whether an officer's belief about the need to render emergency aid was reasonable "must be assessed in light of the particular circumstances confronting the officer at the time." *Kerman*, 261 F.3d at 235 (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also U.S. v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) ("The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action.") (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)).

As all of the parties recognize, an analysis of *Kerman* is crucial to resolving the question of whether the 911 call in this case was sufficiently reliable to justify the warrantless entry into plaintiff's home. In *Kerman*, police officers forcibly entered the plaintiff's home based on an anonymous 911 call. 261 F.3d at 232–33. The caller gave the 911 operator Kerman's address and telephone number and stated that "a mentally ill man at this location was off his medication and acting crazy and possibly had a gun." *Id.* at 232. The caller did not disclose Kerman's name, her own name, or her relationship to Kerman. *Id.* The caller also did not explain how she knew that

Kerman was mentally ill. Under these circumstances, the Second Circuit held that the warrantless entry violated the Fourth Amendment because the "anonymous and uncorroborated 911 call" was insufficient to provide the probable cause necessary to believe there was an urgent need to render aid to a person in distress. *Id.* at 236. Explaining its holding, the court focused specifically on the fact that the defendants had "no corroborating evidence of the alleged danger," *id.*, to establish the call's reliability and that the "sanctity of [a] private dwelling" is "ordinarily afforded the most stringent Fourth Amendment protection," *id.* (quoting *Ayeni v. Mottola*, 35 F.3d 680, 685 (2d Cir. 1994)) (alteration in original).

Since *Kerman*, courts in this circuit have further explored what constitutes a reliable 911 call. In *Anthony v. City of New York*, for example, police officers responded to a 911 call "in which a female caller reported that she was being attacked by a man with a knife and a gun." 339 F.3d 129, 131 (2d Cir. 2003). Upon entering the apartment, the police found the caller, a woman with Down Syndrome, alone and saw no evidence of an attack. *Id.* The Second Circuit held that the officers' warrantless entry was justified by exigent circumstances and explained that "[t]he concern we expressed in *Kerman* regarding the reliability of anonymous and uncorroborated calls—that is, calls reporting an emergency at a different location and involving someone other than the caller—is not implicated here, where the caller expressed an immediate risk of harm to herself, and where the address from which the call was placed was verified." *Id.* at 136.

By contrast, in *Fernandez v. Sacco*, the court held that a 911 call was not sufficient to establish probable cause where the caller reported a "loud ruckus upstairs" and "loud voices" that "sounded like an argument." No. 10 CV 1624 ERK RML, 2012 WL 6102136, at *5 (E.D.N.Y. Dec. 10, 2012). The court differentiated this case from *Anthony* because the call was not from the alleged victim or from a person within the victim's residence. *Id.* at *6. In addition,

the call was "non-specific" and "could not be corroborated by the responding officers' observations." *Id.*

Finally, in *Sha v. New York City Police Dep't Twentieth Precinct, Detectives, Officers Doe*, the police department received a 911 call from a woman named Marlene Glasser. No. 03 CIV. 5273DABGWG, 2005 WL 877852, at *1 (S.D.N.Y. Apr. 18, 2005). Glasser said she had been talking on the phone with her friend, who had suffered a traumatic brain injury in the past and had a history of seizures, when the friend suddenly stopped talking. *Id.* Glasser told the 911 operator that she had tried to reach Sha for thirty minutes and was unable to do so. *Id.* The 911 operator conveyed all of this information to the responding officers. *Id.* at *2. The court held that the officers' belief that exigent circumstances existed was reasonable because, unlike in *Kerman*, the caller was identified by name, address, and phone number. *Id.* at *5. In addition, the caller had described what she believed was Sha's medical history, thereby lending credence to the idea that the plaintiff was in medical distress. *Id.* at *4 ("Accepting Sha's version of the events as true, the police were faced with a situation where an identified individual had provided a plausible account strongly suggesting that another individual was suffering medical distress.").

Despite defendants' arguments to the contrary, *Kerman* and *Fernandez*—not *Anthony* or *Sha*—readily apply to this case. Here, the individual defendants did not know the identity of the caller, the call was not made by the alleged victim from the location of the alleged emergency, the call was not specific as to the alleged harm, and the caller did not assert—and the individual defendants did not have any reason to believe—that plaintiff had a history of mental illness. Indeed, I agree with plaintiff that the information that the police officers and EMTs possessed

before entering plaintiff's apartment was "far less alarming" than that conveyed to the police in *Kerman*, which referred to a weapon, a history of mental illness, and medication.[11] Pl.'s Opp'n 8.

Defendants attempt to distinguish *Kerman* by arguing that the 911 call in this case was neither anonymous nor uncorroborated. City Defs.' Mem. of Law 11; EMT Defs.' Mem of Law 13–14. With respect to anonymity, defendants argue that the 911 call "was not truly 'anonymous,'" City Defs. Mem. of Law 11, because Adry identified himself as plaintiff's "friend," 911 was able to trace his number, he spoke to the 911 operator more than once, and he offered to drive to meet the officers when he could not provide plaintiff's exact address. *See id*; EMT Defs.' Mem. of Law 14.

First, the fact that Adry identified himself as a "friend" of the plaintiff's does not render the call not anonymous or the caller reliable. At best, the descriptor indicates that the caller was motivated by an interest in the plaintiff's wellbeing. At worst, the identifier allowed the caller to cause trouble for plaintiff under the guise of friendship while being protected by the cloak of anonymity. Regardless, it provides no information as to who the caller is, whether one should believe him, or the basis for his concern. *See Fla. v. J.L.*, 529 U.S. 266, 270 (2000) (distinguishing a tip from a "known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" from an anonymous tip which "seldom demonstrates the informant's basis of knowledge or veracity" (internal citation omitted)); *Illinois v. Gates*, 462 U.S. 213, 230 (1983) ("[A]n informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant to determining the value of his report.").

---

[11] Although the EMT defendants argue that "[i]f a potential suicide does not constitute 'exigent circumstances,' very little would," EMT Defs.' Reply Mem. 8, they do not explain how Adry's call is any more worrisome than the call in *Kerman* that a "mentally ill man at this location was off his medication and acting crazy and possibly had a gun." 261 F.3d at 232.

Second, it is irrelevant that the 911 operator could trace Adry's cell phone number. *See*

*U.S. v. Freeman*, 735 F.3d 92, 98 (2d Cir. 2013) ("The fact that the call was recorded and that the

caller's apparent cell phone number is known does not alter the fact that the identity of the caller

is still unknown, leaving no way for the police (or the reviewing court) to determine her

credibility and reputation for honesty."). It is similarly irrelevant that Adry spoke to the 911

operator more than once.[12] *See id.* at 99 ("That the caller contacted 911 twice simply means that

the content of *both* calls could not be assessed based on the caller's reputation for honesty.").

Defendants' only somewhat persuasive argument is that Adry offered to meet the

individual defendants at plaintiff's apartment. It does not appear, however, that the 911 operator

ever conveyed this information to the police officers or the EMTs. Moreover, the promise did

not materialize—the record does not suggest that Adry went to plaintiff's apartment while the

officers and EMTs were there and, thus, he remained anonymous.

As to corroboration, defendants argue that Adry provided the 911 operator with

plaintiff's name—albeit spelled incorrectly—her telephone number, and the information that

ultimately led the individual defendants to the correct location. City Defs.' Mem. of Law 11.

Defendants also argue that "the plaintiff herself corroborated the identity of the 911 caller when

she spoke with Nelson." EMT Defs.' Mem. 14; *see* City Defs.' Mem. 12.

None of these arguments is persuasive. As plaintiff argues, the geographical information

that Adry initially provided the 911 operator was incorrect, such that the individual defendants

could not locate her for at least forty minutes[13] and the defendant police officers abandoned

---

[12] Even if Adry's repeated communication with the 911 dispatcher—instigated by the dispatcher and not Adry, no less—carried some probative weight, the defendant police officers did not know at the time they entered the apartment that the two 911 calls were from the same person. *See* Pl.'s Resp. 56.1 p. 9, ¶ 33; Brown Decl. Ex. M, Audio_74105; Chen Dep. 107:15–22.

[13] Relying on the Prehospital Care Report Summary, plaintiff argues that an hour elapsed between when the

their efforts. Pl.'s Reply Mem. 4; *see* Chen Dep. 43:9–24. The forty-minute lapse in time between

when the EMTs and police officers set out to stop the purported emergency from occurring and

when they made contact with the unharmed plaintiff also suggests that even if an exigency

existed when the call was made, it had dissipated. *See Fernandez*, 2012 WL 6102136, at *8.

More importantly, even if Adry had provided the 911 operator with plaintiff's correct

address—as the caller did in *Kerman*—such information is readily available and does not suggest

that Mizrahi was suicidal or otherwise a danger to herself. That is, "defendants had no

corroborating evidence of the *alleged danger* to establish reliability." *Kerman*, 261 F.3d at 236

(emphasis added); *see also J.L.*, 529 U.S. at 271–72 ("[A] tip [must] be reliable in its assertion of

illegality, not just in its tendency to identify a determinate person [or location]."). Finally, Mizrahi

confirmed Adry's identity as the 911 caller only *after* the individual defendants were already

inside the apartment—not before. *See* Mizrahi Dep. 116:4–7; *Harris v. O'Hare*, 770 F.3d 224, 235

(2d Cir. 2014) ("The core question is whether the facts, as they *appeared at the moment of entry*,

would lead a reasonable, experienced officer, to believe that there was an urgent need to render

aid or take action." (quoting *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011))). This fact

is therefore wholly without value for the warrantless entry analysis.

Ultimately, this case does not differ materially from *Kerman*. I agree with plaintiff that the

individual defendants erroneously relied on "a wholly conclusory and speculative statement

devoid of facts or factual basis" to justify their warrantless entry into her apartment and find that

no exigent circumstances existed as a matter of law. Pl.'s Opp'n 9.

---

individual defendants received their respective calls and when they made contact with Mizrahi. Pl.'s Reply Mem. 4. The parties do not dispute that the Prehospital Care Report Summary so indicates. City Defs.' Resp. 56.1 ¶ 11; EMT Defs.' Resp. 56.1 ¶ 11. Based on the various pieces of evidence presented by the defendants, however, it is possible that only forty minutes elapsed. *See* Brown Decl. Ex. J (Certified Call Log for 911 Call No. 1783), ECF No. 130-10; *Id.* at Ex. K (NYPD's "Event Chronology"). Because the parties do not dispute that at least forty minutes elapsed, I use that figure.

### iii. Qualified Immunity

All individual defendants next argue that, as a matter of law, they are entitled to qualified immunity on plaintiff's warrantless entry claim because, on undisputed facts, it was objectively reasonable for them to believe that plaintiff consented to their entry. City Defs.' Mem of Law 19; EMT Defs.' Mem. of Law 17. The defendant police officers also contend that they are entitled to qualified immunity because, on undisputed facts, it was objectively reasonable for them to believe that a warrantless entry into plaintiff's apartment was justified by exigent circumstances. City Defs.' Mem. of Law 19.

Plaintiff contends that, as a matter of law, the individual EMT defendants are not entitled to raise a qualified immunity defense because they are private parties. Pl.'s Opp'n 10. Thus, plaintiff implicitly seeks summary judgment as against EMTs Nelson and Abeeluck on any defense of qualified immunity. As to the defendant police officers, plaintiff argues that factual disputes preclude granting the officers qualified immunity on their defense of consent to entry. *Id.* at 11. She also implicitly urges entitlement to summary judgment on their qualified immunity defense based on exigent circumstances because the undisputed facts establish the absence of exigent circumstances justifying entry into her apartment.[14] *See id;* Pl.'s Reply Mem. 3–7.

Qualified immunity shields government officials from liability for civil damages "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*)), or if it was "objectively reasonable for [the officer] to believe that his actions were lawful at the time of the challenged act," *Myers v.*

---

[14] Even if plaintiff had not implicitly made this argument, a court may *sua sponte* grant summary judgment "so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex*, 477 U.S. at 326.

*Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (alteration in original) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)). Whether a right was clearly established at the relevant time is a question of law. *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Whether it was objectively reasonable for an officer to believe his acts were lawful is a mixed question of law and fact that "has its principal focus on the particular facts of the case." *Hurlman v. Rice*, 927 F.2d 74, 78-79 (2d Cir. 1991). To assess objective reasonableness, "we look to whether 'officers of reasonable competence could disagree on the legality of the defendant's actions.'" *McGarry v. Pallito*, 687 F.3d 505, 512 (2d Cir. 2012) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995)). If they could not disagree, qualified immunity is not available. *See Zalaski*, 2013 WL 3796448, at *4.

### a. EMTs Nelson and Abeeluck

With regard to EMTs Nelson and Abeeluck, plaintiff is correct that, as private parties, they are not entitled to qualified immunity on her § 1983 claims. *See Toussie v. Powell*, 323 F.3d 178, 180 (2d Cir. 2003) ("[Q]ualified immunity does not protect a private defendant against § 1983 liability where that private defendant is alleged to have conspired with government officials to deprive another of federal rights."); *see also Richardson v. McKnight*, 521 U.S. 399, 412 (1997) ("[Section] 1983 immunity does not automatically follow § 1983 liability."). In addition to the Second Circuit, the majority of circuit courts have rejected qualified immunity for private parties.[15] *See, e.g., Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.*, 413 F.3d 1163, 1169

---

[15] While some courts have granted qualified immunity to private parties, it is typically in situations where the private acts are "isolated, taken at the specific direction of the government, or done without profit or other marketplace incentive." *Bender*, 539 F. Supp. 2d at 714. Because none of these factors weighs in favor of granting

(10th Cir. 2005); *Jensen v. Lane County*, 222 F.3d 570, 578 (9th Cir. 2000); *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999); *see also Bender v. General Services Admin*, 539 F. Supp. 2d 702, 714 (S.D.N.Y. 2008) (collecting additional cases).  I, therefore, grant plaintiff summary judgment on the individual EMT defendants' qualified immunity defense.

### b.  Qualified Immunity Based on Consent

With respect to consent, the law is clearly established: an officer must reasonably believe he has consent prior to making a warrantless entry into a home. *See Schneckloth*, 412 U.S. at 219, 248; *Snype*, 441 F.3d at 130–31. The question therefore is whether it was objectively reasonable for the defendant police officers to believe that the plaintiff consented to their entry. Because, for the reasons discussed above at pages 19–25, there are facts still in dispute that are material to this determination, their motion for summary judgment based on qualified immunity is denied. *See Kerman*, 261 F.3d at 229 ("'[T]he parties' versions of the facts differ . . . and '[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.'") (third alteration in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)); *Doutel v. City of Norwalk*, No. 3:11-CV-01164 VLB, 2013 WL 3353977, at *13 (D. Conn. July 3, 2013) ("[A] grant of qualified immunity is inappropriate at this stage because the parties' vague and conflicting accounts of what transpired prior to the officers' entry into the . . . household leave genuine issues of material fact which a jury must resolve."); *Mangino v. Incorporated Village of Patchogue*, 739 F. Supp. 2d 205, 243 n.33 (E.D.N.Y. 2010) (holding that "there are still disputed issues of fact regarding whether [the defendant] did consent and, if so, whether the consent was voluntary, that preclude summary judgment on the unlawful entry claim, including on the issue of qualified immunity").

---

the individual EMT defendants qualified immunity, they are not entitled to its protection.

### c. Qualified Immunity Based on Exigent Circumstances

The law of exigent circumstances is also clearly established—and has been since 2001: "officers may not rely on an anonymous and uncorroborated 911 call to justify a warrantless entry into a private dwelling. . . . [S]uch a call, by itself, [can]not provide the foundation for a reasonable belief that exigent circumstances existed." *Kerman*, 261 F.3d at 238; *see also Fernandez*, 2012 WL 6102136, at *7 ("The law is clearly established that a warrantless entry into a home, even to render assistance to a person in need, requires probable cause."). As discussed above, the defendants cannot persuasively distinguish this case from *Kerman*. Although the qualified immunity standard is "forgiving," *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010), the facts of this case—viewed in the light most favorable to the defendant police officers—so closely mirror those in *Kerman* that no reasonable officer could conclude that the defendant police officers' actions were lawful. Even if *Kerman* were not "directly on point, . . . precedent [has] spoken with sufficient clarity to have placed the constitutional question 'beyond debate.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Accordingly, plaintiff is entitled to summary judgment dismissing the defendant police officers' affirmative defense of qualified immunity with respect to the existence of exigent circumstances. The defendant police officers' motion for summary judgment on this basis is, therefore, denied as a matter of law and they may not advance this defense at trial.

### C. False Arrest

I next address Mizrahi's claim that the individual defendants illegally arrested her and took her to the hospital against her will. EMTs Nelson and Abeeluck move for summary judgment on this claim, arguing that, as a matter of law, plaintiff consented to go to the hospital. *See* EMT Defs.' Mem. of Law 10–11. Officers Chen and Corrado similarly move for summary

judgment on the claim, arguing that plaintiff consented to her hospitalization. *See* City Defs.'
Mem. of Law 13–14. Unlike the EMTs, the police officers also argue that there was probable
cause to detain and arrest plaintiff because they reasonably believed that she posed a danger to
herself. *Id.* at 14–17. Further, all of the individual defendants assert that, at minimum, they are
entitled to qualified immunity on plaintiff's false arrest claim. *See* City Defs.' Mem. of Law 20–
21; EMT Defs.' Mem of Law 11–13. Plaintiff opposes summary judgment on the defense of
consent, denying that she consented to go to the hospital. Pl.'s Opp'n 15–19. She also moves for
summary judgment against the defendant police officers' defense of probable cause. *Id.* at 13–15;
Pl.'s Mem. 7–10.

The Fourth Amendment's protection against unreasonable searches and seizures
"adheres whether the seizure is for purposes of law enforcement or due to an individual's
mental illness." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016). The elements for a claim of
false arrest under § 1983 are substantially the same as those under New York law. *Weyant v. Okst*,
101 F.3d 845, 852 (2d Cir. 1996). To prevail on a claim for false arrest under New York law, a
plaintiff must show: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was
aware of the confinement, (3) "the plaintiff did not consent to the confinement, and (4) the
confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir.
1995). Only the last two prongs are at issue. I address each in turn.

### i. Consent

All of the individual defendants argue that they are entitled to summary judgment on the
defense of consent because plaintiff willingly went to the hospital. They point to plaintiff's
statement, "if you wanna take me, take me, it's all right" as well as plaintiff's request to go to
Maimonides Hospital, rather than Coney Island Hospital, as evidence of plaintiff's consent.

EMT Defs.' Mem. of Law 10–11; City Defs.' Mem. of Law 13–14. They further argue that plaintiff consented to go to the hospital because she did not refuse to go and because she walked by herself without assistance or force to the ambulance. EMT Defs.' Mem of Law 10–11; City Defs.' Mem. of Law 13–14. Plaintiff argues that whether she consented is a disputed factual issue and that, under the circumstances, a reasonable jury could find that she "had no other choice but to submit to the [d]efendants' demands," Pl.'s Opp'n 2, 15.

When stripped of their context, plaintiff's statements and actions may suggest that she consented to go to the hospital, but, when viewed in their totality, they simply underscore the disputed nature of the facts in this case. For example, the defendant police officers characterize plaintiff's statement "'if you wanna take me, take me,'" as "unprompted" and, thus, evidence that she "offered her consent to be taken to the hospital." City Defs.' Mem. of Law 13. As plaintiff argues, however, she made this statement only after EMT Nelson told her that the officers "can't leave you here." Pl.'s Opp'n 15–16; *see* Brown Decl. Ex. H, at 01:34-01:37, 04:03–04:06. Nelson's statement to Mizrahi in the apartment directly contradicts the individual EMT defendants' argument that "there is simply no evidence . . . that the defendants told Mizrahi that . . . they could not and would not leave without her." EMT Defs.' Reply Mem. 6. Moreover, a reasonable jury could conclude that plaintiff's use of the word "take" indicates that she was not yielding voluntarily. *See* Black's Law Dictionary (defining "take" as "to obtain possession or control, whether legally or illegally" and "to seize with authority; to confiscate or apprehend"). I agree with plaintiff that, given these facts, a reasonable jury could conclude that plaintiff's comment merely demonstrates acquiescence in the individual defendants' perceived authority. *See* Pl.'s Opp'n 15.

Defendants' argument that plaintiff "requested" to go to Maimonides hospital and, therefore, consented to the arrest is similarly unpersuasive. *See* EMT Defs.' Mem. of Law 10; City Defs.' Mem. of Law 13. After EMT Nelson directed her to get dressed, Mizrahi asked, "why are you taking me now?" to which EMT Nelson responded, "ma'am, we can't leave you here." Brown Decl. Ex. H, at 04:00–04:06. When Mizrahi asked the question again, EMT Nelson said that because of Adry's call "you can prove us wrong, prove him wrong. You go to the hospital, you speak to someone. You tell them, the doctor." *Id.* at 04:10–04:25. Plaintiff then inquired where the individual defendants intended to "take" her. *Id.* at 04:25. After they responded Coney Island Hospital, plaintiff asked, "Can you take me to Maimonides *at least*?" *Id.* at 04:30–04:32 (emphasis added). Contrary to defendants' arguments, this exchange does not prove that, as a matter of law, plaintiff consented to go to the hospital. Rather, it demonstrates that EMT Nelson told plaintiff that she would not be left alone in her apartment, that she would be "go[ing] to the hospital," and that, upon hearing where the individual defendants intended to take her, plaintiff asked "at least" to be taken to Maimonides Hospital. When viewed in context, a reasonable juror could interpret plaintiff's statement not as a request to go to the hospital full stop but, instead, as a plea to go to a hospital that was familiar to her, given the inevitability that she would be going *somewhere*. That is, the exchange provides the basis for reasonable jurors to make different inferences—not for the court to award summary judgment to the defendants.

Defendants' contention that plaintiff's failure to object or refuse to go to the hospital implies consent is not tenable. *See Seifert*, 933 F. Supp. 2d at 317 ("[M]ere silence or the failure to object . . . does not constitute consent unless the totality of circumstances so indicates.") (quoting *United States v. Taylor*, 279 F. Supp. 2d 242, 245 (S.D.N.Y. 2003)). First, it is not clear that plaintiff did *not* object given that she repeatedly told the individual defendants that she was

"fine" and that she did not want to speak to "someone." *See* Brown Decl. Ex. H, at 02:05–02:11. As EMT Nelson conceded at her deposition, this may have indicated that plaintiff did not want to go to the hospital. *See* Nelson Dep. 82:7–83:2. Second, there is no evidence that any of the EMTs or police officers ever asked plaintiff if she *wanted* to go to the hospital. *See Real Prop. & Premises Known as 90-23 201st St., Mollis, New York*, 775 F. Supp. 2d 545, 556 (E.D.N.Y. 2011) ("The government bears the burden of proving by a preponderance of the evidence that an individual's consent . . . was voluntary."). Instead, the audio recording of what occurred in the apartment and the individual defendants' depositions demonstrate only that plaintiff did not refuse to go. *See, e.g.*, Nelson Dep. 69:15–17, 82:7–12, 174:3–9 ("Okay, the paper did not have her signature to say she [consented], but she did not refuse to go in the ambulance with us to the hospital."). Third, the EMTs and police officers never apprised plaintiff of her right not to go to the hospital.[16] *See U.S. v. Pena Ontiveros*, 547 F. Supp. 2d 323, 331 (2d Cir. 2008) ("[K]nowledge of the right to refuse consent is not a requirement to a finding of voluntariness, though it may be a factor in ascertaining whether the consent was coerced.").

Citing only cases about consent to entry and to search, *see* City Defs.' Reply Mem. 1–4, defendants assert that courts have found consent in situations "that seem far more threatening than those presented here." City Defs.' Reply 2 n.7 (quoting *Bartee*, 2013 WL 6164336, at *11). However, "whether the arrest was effectuated through . . . use of force[] or display of weaponry" is not the only factor that courts consider in a determination of voluntariness. *Mangino*, 739 F. Supp. 2d at 245. Indeed, "[a]ccount must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who [allegedly] consents." *Id.* at 246

---

[16] It is also worth noting that, had Mizrahi refused, EMT Abeeluck would have seen that as an indication that she was being uncooperative. *See* Abeeluck Dep. 136:3-7.

(quoting *United States v. Guzman*, 724 F. Supp. 2d 434, 441–42 (S.D.N.Y. 2010)). In light of EMT Nelson's repeated statements that the officers would not leave plaintiff alone, the presence of multiple officers in plaintiff's home, and Officer Chen's instruction to plaintiff not to lock her bedroom door while changing her clothes, a reasonable jury could conclude that plaintiff did not consent to confinement within her apartment or consent to go to the hospital. *See Bumper v. North Carolina*, 391 U.S. 543, 549 n.14 (1968) ("Orderly submission to law enforcement officers who, in effect, represent to the defendants that they had the authority to enter and search the house, against his will if necessary, was not . . . consent.") (quoting *United States v. Elliott*, 210 F. Supp. 357, 360 (D. Mass. 1962)). The circumstantially distinguishable cases that defendants cite do not alter this conclusion. *See e.g.*, *United States v. Crespo*, 834 F.2d 267, 271–72 (2d Cir. 1987) (affirming a finding of consent to search based, in part, on the district court judge's credibility assessments); *United States v. Pena Ontiveros*, 547 F. Supp. 2d 323, 334 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Rico Beltran*, 409 F. App'x 441 (2d Cir. 2011) (finding that the defendant consented to search where, among other things, he "faced no questioning prior to the consent being given"); *United States v. Ramirez*, 903 F. Supp. 587, 589, 591 (S.D.N.Y. 1995) (finding consent to search where the defendant read and signed a consent to search form).

Because a reasonable jury could interpret plaintiff's comments in her apartment as acquiescence to the seeming authority of the individual defendants, I deny defendants' motions for summary judgment on plaintiff's false arrest claim based on the defense of consent.

### ii.    Probable Cause

The defendant police officers next argue that even if plaintiff did not consent to her confinement, there was probable cause to believe that she posed a danger to herself based on the information they received from 911 and "plaintiff's statements to EMT Nelson that she was

sad." City Defs.' Mem. of Law 14. They also argue that they were "entitled to rely on the EMTs'

determination to detain plaintiff because she was a danger to herself." *Id.* at 15. Plaintiff denies

that there was evidence to suggest that she posed a danger to herself and seeks summary

judgment on the officers' defense of probable cause. Pl.'s Mem. of Law 9–10; Pl.'s Reply Mem.

7–10.

Under New York State Mental Hygiene Law § 9.41, "any peace officer" has the authority

to take an individual into custody if she "appears to be mentally ill and is conducting himself or

herself in a manner which is likely to result in serious harm to the person or others." N.Y.

Mental Hyg. Law § 9.41. The Mental Hygiene Law defines "likely to result in serious harm," in

part, as "a substantial risk of physical harm to the person as manifested by threats of or attempts

at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to

. . . herself . . . ." N.Y. Mental Hyg. Law § 9.01. To determine whether the confinement is

privileged, courts apply the same concepts of probable cause and objective reasonableness as

they do in criminal cases. *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 233 (E.D.N.Y. 2015);

*see also Kerman*, 261 F.3d at 235 n.8 ("We interpret [N.Y. Mental Hyg. Law § 9.41] consistently

with the requirements of the Fourth Amendment and therefore assume that the same objective

reasonableness standard is applied to police discretion under this section.").

"A warrantless seizure for the purpose of involuntary hospitalization 'may be made only

upon probable cause, that is, only if there are reasonable grounds for believing that the person

seized' is dangerous to herself or to others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d

Cir. 2003) (quoting *Glass*, 984 F.2d at 58). For a mental health seizure, a showing of probable

cause requires "a probability or substantial chan[c]e of dangerous behavior, not an actual

showing of such behavior." *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 622 (S.D.N.Y.

2015) (quoting *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)), *aff'd*, 665 F. App'x 49 (2d Cir. 2016). "Probable cause for involuntary hospitalization may be established from 'information gleaned from informants[,] . . . normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.'" *Sawabini v. McGrath*, No. 315CV692LEKDEP, 2017 WL 3727370, at *8 (N.D.N.Y. Aug. 28, 2017) (quoting *Hicks v. City of New York*, No. 12-CV-5081, 2015 WL 5774575, at *5 (E.D.N.Y. Aug. 27, 2015)). If probable cause exists, the confinement is privileged. *See Weyant*, 101 F.3d at 852; *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). To determine whether a mental-health seizure is justified, a court "must review the specific observations and information available to the officers at the time of a seizure." *Myers*, 819 F.3d at 633; *see also Bayne v. Provost*, No. 1:04 CV 44, 2005 WL 1871182, at *7 (N.D.N.Y. Aug. 4, 2005) ("[T]he question here is whether the facts and circumstances known to the Troopers at the time they determined to take Plaintiff into custody were sufficient to warrant a person of reasonable caution in the belief that Plaintiff might be 'mentally ill and [ ] conducting himself in a manner [ ] likely to result in serious harm to' himself . . . .") (quoting *Monday*, 118 F.3d at 1102).

The information available to the individual City defendants when they made the decision to confine plaintiff was insufficient to constitute probable cause. First, the 911 call on which the defendant police officers rely cannot provide the basis for a reasonable belief that plaintiff was a danger to herself. *See Kerman*, 261 F.3d at 258. Insufficient as it was for entry, the call provided even less of a reason to seize the plaintiff in light of the additional evidence available to the officers once they made contact with her. *See id.* Even if it had been reasonable for the officers not to question the 911 caller's reliability before entering plaintiff's apartment, once inside, plaintiff's sentiments about her poor relationship with Adry and her repeated descriptions of

him as a "liar," Brown Decl. Ex. H., at 01:45, 04:16 & 04:46, should have given the officers pause about trusting the information that he provided. *See Sankar v. City of New York*, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012) ("[W]here . . . a bitter prior relationship exists 'and *is known to the arresting officer before the arrest is made*, the complaint alone may not constitute probable cause.'") (third alteration in the original) (quoting *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998)); *cf. Bayne*, 2005 WL 1871182, at *8 (finding probative as to the existence of probable cause that, in addition to receiving a phone call from the plaintiff's nurse alleging threats of suicide, the defendant police officers spoke to the nurse after their arrival on the scene and confirmed her account of the plaintiff's suicide threat).

Second, even viewing the evidence in the light most favorable to the police officers, nothing that plaintiff said or did in her apartment would lead a reasonable police officer to believe that she was suicidal or that there was "a probability or substantial chance of dangerous behavior." *Heller*, 144 F. Supp. 3d at 622. Plaintiff did not threaten suicide—and denied ever having done so. *See* Brown Decl. Ex. H., at 01:07–01:25; *Rzayeva v. Foster*, 134 F. Supp. 2d 239, 248 (D. Conn. 2001), *aff'd sub nom. Rzayeva v. Santos*, 67 F. App'x 75 (2d Cir. 2003) (finding probable cause to involuntarily commit the plaintiff where, in the presence of the defendant officer, "the plaintiff threatened to cut her wrists and to throw herself out a third floor window"). Her apartment was not in disarray. *See Kerman*, 261 F.3d at 241 ("[T]he police may have been entitled to hospitalize Kerman if . . . the condition of his apartment demonstrated a dangerous mental state."); *see also Roffman v. Knickerbocker Plaza Assocs.*, No. 04 CIV. 3885 (PKC), 2008 WL 919613, at *8 (S.D.N.Y. Mar. 31, 2008) (listing, among others, "the presence of the 'fireload' of stacked papers" and "the burned pot on the hot stove" as factors supporting the court's finding that the defendants had an objectively reasonable basis for their belief that the

plaintiff posed a danger to herself). She did not attempt to barricade herself. *See Quon v. Henry*, No. 14-CV-9909 (RJS), 2017 WL 1406279, at *8 (S.D.N.Y. Mar. 27, 2017), *appeal dismissed* (Aug. 8, 2017). And she was not acting in an erratic, agitated, or incoherent manner. *See Glass*, 984 F.2d at 57–58 (holding that probable cause existed to involuntarily hospitalize the plaintiff where he threatened someone with a gun and was acting "strange. . . . hostile, guarded, angry, suspicious, uncooperative, and paranoid"); *Bayne*, 2005 WL 1871182, at *8 (determining that probable cause existed for involuntary hospitalization where, among other things, the plaintiff had a "clearly agitated mental state"). Despite the City defendants' assertions in their briefing, *see* City Defs.' Reply Mem. 8–9, the individual defendants' depositions provide no evidence to the contrary.[17]

The City defendants' additional arguments to support their position are unpersuasive. The fact that Mizrahi told the individual defendants that she was "sad" does not mean that it was reasonable to believe that she was suicidal—a fact that EMT Nelson acknowledged. *See* Nelson Dep. 71:25–72:18. Regardless, Mizrahi's statement unquestionably does not constitute grounds for detaining her or taking her to the hospital against her will. *Cf. Greenaway*, 91 F. Supp. 3d at 234 ("The . . . [d]efendants fail to show that engaging in 'bizarre and unreasonable' behavior, including stripping naked and rubbing paint on oneself inside one's own residence is 'likely to result in serious harm to the person or others.'"). It is also not true that plaintiff's alleged consent to go to the hospital "suggest[s] that plaintiff was experiencing mental health

---

[17] For example, when asked whether the plaintiff did or said anything to indicate that she was acting in an aggressive or violent manner, both EMT Nelson and Officer Chen said no. Nelson Dep. 71:15–21; Affirmation of Nathaniel B. Smith in Supp. of Pl.'s Mot. for Partial Summ. J. ("Smith Affirm."), Ex. 13 ("Pl.'s Excerpted Chen Dep."), at 57:13-14, 58:6-7; 78:7–9, ECF No. 140-13; *see also* Abeeluck Dep. 92:9–10. When asked whether the plaintiff did "anything to suggest . . . that she was suicidal" or "that indicated . . . she might want to hurt herself," the defendants again said no. *See, e.g.*, Nelson Dep. 71:22–73:3. According to EMT Nelson, plaintiff was "in her right mind," "alert," "oriented," "speaking coherently," and not "impaired in any way." *Id.* 73:4–25; Abeeluck Dep. 114:19–115:25. In addition, Officer Chen went so far as to say that he "determined that she [was] not [a] danger to herself or us." Pl.'s Excerpted Chen Dep. 78:7–8.

symptoms." City Defs.' Mem of Law 14–15. On the contrary, the argument that plaintiff consented to go to the hospital cuts against the notion that she was in such an unstable state that the officers had probable cause to detain her.[18] *See Ruhlmann v. Ulster Cty. Dep't of Soc. Servs.*, 234 F. Supp. 2d 140, 173 (N.D.N.Y. 2002) ("It is difficult to see how 'consent' has any place in the 'involuntary' admission context. . . . [T]o argue that plaintiff's consent has relevance to the claims herein necessarily implies that admission and treatment were voluntary, not involuntary.").

The defendant police officers' argument that they reasonably relied on the individual EMT defendants' determination that Mizrahi posed a danger to herself also fails.[19] EMTs Nelson and Abeeluck deny making the dangerousness determination on which Officers Chen and Corrado claim that they relied. *See* Nelson Dep. 48:7–12; 49:12–13; Abeeluck Dep. 76:21– 23, 78:14–17. Indeed, EMTs Nelson and Abeeluck deny possessing the requisite qualifications to determine that someone is an EDP, *see* Nelson Dep. 48:13 –49:2, 50:4–5; Abeeluck Dep. 78:14–17, and the City defendants provide no evidence to suggest that they do. There is, therefore, a disputed factual issue as to whether the individual EMT defendants made the determination on which the defendant police officers say that they reasonably relied, thus precluding a grant of summary judgment for the police officers on this claim.

---

[18] In their reply brief, the City defendants also argue that probable cause existed to seize Mizrahi because she "had a bottle of potentially fatal prescription tranquilizers in her apartment." City Defs.' Reply Mem. 10. Defendants did not make this argument in their moving papers. I therefore need not address it. *Cf. Keefe ex rel. Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995). I note, however, that, to the extent the defendant police officers were actually concerned about the medication, they could have called the doctor who prescribed it whose name was on the bottle. *See Kerman*, 261 F.3d at 241. More importantly, even in the presence of medication, the police officers must still have reasonably believed that plaintiff posed or could have posed a danger to herself in order to proceed with an involuntary seizure.

[19] The City defendants make this argument in the contexts of both probable cause and qualified immunity.

More importantly, even if EMTs Nelson and Abeeluck had determined that plaintiff was an EDP, it was not reasonable for the police officers to defer to the EMTs *in this situation*. A probable cause determination is fact-specific. Here, the defendant police officers possessed the *same* information as the EMTs—that an anonymous person, purporting to be plaintiff's "friend," called 911 to say that plaintiff was suicidal—and made the same observations that the EMTs did—that the plaintiff exhibited no signs of dangerous or suicidal behavior. Given that the defendant officers did not observe the plaintiff engaging in any troubling behavior or see anything in plaintiff's apartment that would be cause for concern, there was ample reason to doubt the validity of the individual EMT defendants' alleged determination. *See Kerman*, 261 F. 3d at 241 (explaining that an officer "is not free to disregard plainly exculpatory evidence"); *Matthews v. City of New York*, 2016 WL 5793414, at *4 (2016) (finding that the plaintiff had sufficiently alleged that there were no facts to establish probable cause for her arrest and hospitalization where she claimed she was calm and the defendants had the opportunity to observe her behavior).

While it may be reasonable for a police officer to rely on an EMT's medical assessment in certain situations, an officer cannot evade responsibility by blindly deferring to an EMT in spite of overwhelming evidence to the contrary.[20] *See Kerman*, 261 F.3d at 241("[A] fact-finder could well find that the police acted outside the bounds of both the Fourth Amendment and the qualified immunity standards of objective reasonableness . . . . [if he or she found that] the police not only failed to reasonably investigate [Kerman's] mental state, [but] also grossly misjudged the

---

[20] In a prior opinion on a motion to dismiss in this case, I noted that a police officer's training "could not be expected to override the judgment of a medical professional." Opinion & Order, dated Dec. 21, 2015, at 6, ECF No. 10. As explained above, however, the City defendants have not offered any evidence that the individual EMT defendants possess pertinent qualifications such that I should accord their alleged determination heightened deference. This is especially true in light of the fact that EMTs Nelson and Abeeluck affirmatively deny possessing those qualifications.

situation as it unfolded before them."); *see also Lozada*, 92 F. Supp. 3d at 91 (finding that the defendant state trooper could not rely on information provided by EMTs where the state trooper "had the opportunity to observe [p]laintiff and make his own determination as to whether her behavior warranted arrest"); *Schofield v. Magrey*, No. 3:12CV544 JBA, 2015 WL 521418, at *5 (D. Conn. Feb. 9, 2015) ("[W]here a defendant has 'knowledge of the facts that rendered the conduct illegal,' he may be liable even where his participation in the illegality is only "'indirect"—such as . . . helping others to do the unlawful acts."") (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). Even if it is true that the defendant police officers consistently rel[y]" on EMTs to determine whether an individual is an EDP, *see* City Defs.' Mem. of Law 15, that alleged fact does not render the decision to do so in this situation reasonable even if it could, as discussed below, support a finding of qualified immunity.

For these reasons, I find that the defendant police officers did not have probable cause to seize plaintiff as a matter of law. I therefore deny their motion for summary judgment based on this defense and grant plaintiff's corresponding motion for summary judgment. Thus, Officers Chen and Corrado are precluded from raising this defense at trial.

### iii.    Qualified Immunity

Even if plaintiff did not consent to confinement, all of the individual defendants argue that they are entitled to qualified immunity on plaintiff's false arrest claim because it was objectively reasonable for them to believe that plaintiff consented to go to the hospital. City Defs.' Mem. of Law 20; EMT Defs.' Mem. of Law 11–12. Officers Chen and Corrado also argue that they are entitled to qualified immunity because "the law in this [c]ircuit is not clearly established as to police officers' duties relative to EMS operations" and because it was objectively reasonable for them to rely on the individual EMT defendants' alleged determination

that it was necessary to detain plaintiff. City Defs.' Mem. of Law 20–21. Plaintiff resists

summary judgment on the issue of qualified immunity, contending that the individual EMT

defendants are not entitled to qualified immunity because they are private parties. Pl.'s Opp'n 20.

Further, she urges that any finding of qualified immunity in favor of the defendant police

officers on her false arrest claim is, at this juncture, precluded by disputes of material fact. *Id.*

### a. EMTs Nelson and Abeeluck

As explained above, EMTs Nelson and Abeeluck are not entitled to qualified immunity

on plaintiff's false arrest claim because they are private parties. *See supra* p. 33–34.

### b. Qualified Immunity Based on Consent

With respect to consent, the law regarding voluntariness was clearly established at the

time of this incident. Moreover, the same disputes of material fact that preclude any finding that

plaintiff consented to detention in her apartment or consented to go to the hospital also

preclude any finding as a matter of law that it was objectively reasonable for the defendant

police officers to believe that she did. Although defendants urge that plaintiff communicated

mixed messages relating to the existence of consent, "[c]redibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge." *Anderson*, 477 U.S, at 255. Viewing the evidence—and the inferences that arise

from the evidence—in a light most favorable to the plaintiff, defendants have not shown that no

reasonable jury could conclude that officers' actions were "objectively unreasonable." *O'Bert ex

rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (quoting *Ford v. Moore*, 237 F.3d 156,

162 (2d Cir. 2001)); *see Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 459 (S.D.N.Y. 2012)

("Here, there are material factual disputes, including the inferences that arise from the facts,

relating to the legality of the entry into [plaintiff's] apartment and her arrest, precluding resolution of the qualified immunity defense on summary judgment.").

### c. Qualified Immunity Based on Probable Cause

#### i. The Absence of Clearly Established Law

On the issue of probable cause, Officers Chen and Corrado argue that they are entitled to qualified immunity because the law in this circuit is not clearly established as to how police officers should interact with EMS when both entities respond to an emergency. City Defs.' Mem. of Law 20–21. In urging the absence of clearly established law, however, the defendant officers misunderstand what law governs the issue posed in this case. While it is true that courts cannot "define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, the right at issue here is not the broad right to be free from unreasonable seizures absent probable cause. Rather, it is the specific right not to be involuntarily seized for psychiatric or medical attention absent probable cause to believe that the person presents a danger to himself or others. This right is clearly established and it—not how EMTs and police should work together—is the law at issue in this case. *See Green v. City of New York*, 465 F.3d 65, 83–84 (2d Cir. 2006) (holding that "it was clearly established at the time of the incident under review that a competent adult could not be seized and transported for treatment unless she presented a danger to herself or others") (citing *Glass*, 984 F.2d at 57). Indeed, for the law to be clearly established, it is not necessary that the "action in question has previously been held unlawful," but only that "in the light of pre-existing law the unlawfulness [would] be apparent [to a reasonable official]." *Anderson*, 483 U.S. at 640 (citations omitted). There are, therefore, no questions about the law governing the legality of the defendants' alleged conduct in this case that warrant granting the defendant police officers qualified immunity as a matter of law.

### ii.    *Objective Reasonableness*

Officers Chen and Corrado could still be entitled to summary judgment on plaintiff's claim of false arrest if undisputed facts establish that their beliefs and corresponding actions were objectively reasonable, thus conferring upon them qualified immunity. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("[T]he analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause."). In the false arrest context, an officer is entitled to qualified immunity where there was "arguable" probable cause for the arrest. *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Escalera v. Lunn*, 361 F. 3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). However, arguable probable cause "should not be misunderstood to mean 'almost' probable cause," and if "officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Gonzales v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

Applying this doctrine here, qualified immunity is, at the outset, precluded by disputed issues of material fact. Even if those issues were resolved, however, the factual record before me is insufficiently developed to address the question of objective reasonableness. *See generally Myers,* 819 F.3d at 633 (finding that the district court erred in granting qualified immunity on summary judgment where the record contained insufficient evidence to support the conclusion that the officer reasonably believed that plaintiff was dangerous to herself or others).

First, as stated previously, the factual record is unclear concerning whether it was the individual EMT defendants who made the determination that plaintiff was an EDP. Although Officers Chen and Corrado contend that the individual EMT defendants *did* make this determination, EMTs Nelson and Abeeluck deny both doing so and being qualified to do so. Likewise, the record is unclear as to whether it would have been reasonable for the defendant police officers to conclude from the individual EMT defendants' actions that the EMTs had made such a determination.

Moreover, the current factual record is too sparse to determine, whether, as the attorney for the defendant police officers argues in his legal memorandum, it is actually the "practice" of these defendants to defer to EMTs in the context of EDPs. *See* City Defs.' Mem. of Law 15. In addition, the current record provides little or no evidence pertinent to assessing whether, if the officers did accord deference to the judgment of the EMTs, their determination to do so would have been objectively reasonable. Beyond the defendant officers' own somewhat ambiguous testimony on the point,[21] the only evidence in the record is the New York City Police Department Patrol Guide concerning how police officers should interact with emotionally disturbed persons. *See* Reply Decl. of Cherie Brown in Further Supp. of City Defs.' Summ. J. Mot. ("Brown Reply Decl."), Ex. U ("Patrol Guide Procedure No. 216-05"), ECF No. 137-7. As plaintiff argues, these guidelines do not indicate that police officers, in determining whether to arrest such a person as a danger to herself, should defer to EMTs or anyone else. *See* Patrol Guide Procedure No. 216-5; Pl.'s Opp'n 20–21; *see also* City Defs.' Reply Mem. 12 (describing the Patrol Guide as "completely silent as to EMS"). The record does not address department-

---

[21] Although both officers attest that it is their own practice to defer to EMTs in the context of EDP determinations—an assertion a reasonable jury need not credit—they do not clearly assert that their own "practice" is department-wide or otherwise pervasive. *See* Chen Dep. 116:12–24; Corrado Dep. 35:17–20.

wide or even precinct-wide policies on this issue. Nor does it elucidate any instruction the officers may have received from superiors regarding how to handle these situations—be it written instruction, instruction as part of general training, or explicit instructions in the field. It is thus not possible to assess the nature or pervasiveness of the officers' training by superiors in the department that may render the individual police defendants' asserted deference to the EMTs' judgment objectively reasonable, notwithstanding settled legal principles to the contrary.

To support their position, the officers cite *Kraft v. City of New York*, in which the court granted qualified immunity to two police officers who helped transport an assumed EDP to the hospital.[22] City Defs.' Reply Mem. 11. In *Kraft*, however, numerous factors absent here led the court to conclude that the officers were entitled to qualified immunity. Chief among them is that it was "undisputed" in *Kraft* that an EMS supervisor made the ultimate decision to transport plaintiff to the hospital. 696 F. Supp. 2d at 420. Therefore, there was no question—as there is here—as to who bore responsibility for the decision to seize the plaintiff.

In addition, the *Kraft* court emphasized that it was objectively reasonable for the police defendants to rely on the EMS supervisor's instruction to transport the plaintiff to the hospital because that instruction was "apparently valid." *Id.* (quoting *Anthony*, 229 F.3d at 138). It was "apparently valid" in light of, among other things, first-hand information provided to *both* the police defendants and EMS personnel by three people at the scene. Thus, the defendant officers were entitled to qualified immunity because it was objectively reasonable to rely on the EMT supervisor's decision *because* that decision was supportable in light of surrounding circumstances.

---

[22] The City defendants discuss *Kraft* at length in the part of their reply brief that addresses probable cause. *See* City Defs.' Reply Mem. 11. They do so mistakenly, however, because *Kraft* addressed only qualified immunity. *See* 696 F. Supp. 2d 403, 418 (S.D.N.Y. 2010).

In sum, I deny the defendant police officers' motion for summary judgment on plaintiff's false arrest claim on the basis of qualified immunity because there are disputed issues of material fact and because the factual record as it currently stands does not allow me to assess whether the police officers' alleged deference to the EMTs' judgment was objectively reasonable. [23]

### D. Failure to Intervene

The defendant officers also move to dismiss plaintiff's claim for failure to intervene. City Defs.' Mem. of Law 17–18. They make four arguments. First, they argue that plaintiff failed to establish the existence of an underlying constitutional violation. *Id.* at 18. Second, they argue that it is not clear that the duty to intervene extends to intervention in unlawful actions by EMS personnel. *Id.* at 17. Third, they contend that a reasonable officer could not have known that plaintiff's constitutional rights had been violated. *Id.* at 18. Fourth, they argue that plaintiff cannot allege that the defendant officers both directly engaged in unconstitutional conduct and also failed to intervene to stop that conduct. *Id.* In response, plaintiff contends that defendant police officers "simply stood by and let Nelson make the seizure decision, a decision that the law required [the officers to] make." Pl.'s Opp'n 22.

It is widely recognized that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know" that other officers are violating a person's constitutional rights. *Id.* Liability may attach only when "(1) the officer had a

[23] To the extent plaintiff implicitly seeks summary judgment on the City defendants' defense of qualified immunity, I deny her summary judgment for the same reasons.

realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminsi*, 839 F.2d 9, 11–12 (2d Cir. 1988)).

The defendant police officers' first argument that plaintiff has not established the existence of an underlying constitutional violation fails. As discussed above, plaintiff's unlawful entry and arrest claims survive defendants' motions for summary judgment.

The officers' second argument likewise fails. Whether the officers' duty to intervene extends to the actions of the individual EMT defendants depends, in part, on whether EMTs Nelson and Abeeluck were state actors. *See Adickes*, 398 U.S. at 150–52; *Ramirez v. City of Chicago*, 82 F. Supp. 2d 836, 840–841 (N.D. Ill. 1999). Because, as explained above, that question must go to a jury, I cannot conclude as a matter of law that the defendant police officers did not have a duty to intervene on this basis.

Nor can the defendant police officers prevail on their argument that they could not have known that plaintiff's constitutional rights had been violated. It is undisputed that the defendant officers were present for the entire interaction with the plaintiff until plaintiff entered the ambulance. Given that a reasonable jury could find that the individual defendants illegally entered her apartment and confined her against her will, a reasonable jury could likewise find that the defendant officers knew or should have known that plaintiff's constitutional rights were being violated by the EMTs and, thus, that the officers had an obligation to intervene.

As to their final argument, the defendant police officers are correct that a jury cannot find them liable for directly engaging in unconstitutional conduct and for failing to intervene to stop that conduct. *See Jackson v. City of New York*, 939 F. Supp. 2d 219, 232 (E.D.N.Y. 2013).

However, it is possible that a jury could conclude that the individual EMT defendants—and not the defendant police officers—were directly responsible for the false arrest but that the officers failed to intervene to stop the false arrest. *See Mack v. Town of Wallkill*, 253 F. Supp. 2d 552, 559 (S.D.N.Y. 2003); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim."). For these reasons, I deny the defendant police officers' motion for summary judgment on plaintiff's failure to intervene claim.

## II.    <u>State Claims</u>

### A.  False Imprisonment

As with plaintiff's federal false arrest claim, defendants seek summary judgment on plaintiff's second cause of action for false imprisonment under New York law. *See* Defs.' Mem. of Law 22; EMT Defs.' Mem. of Law 4–13. "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr*, 944 F.2d at 96. As stated earlier, the elements of a cause of action for false arrest brought under the Fourth Amendment and New York law are substantially the same. *See Weyant*, 101 F.3d at 852. For the reasons stated in pages 35–47, therefore, I deny defendants' motions for summary judgment on plaintiff's state false imprisonment claim.

### B.  IIED

Both sets of defendants seek summary judgment on plaintiff's claim that they committed the tort of intentional infliction of emotional distress. Defendants assert that plaintiff has not met her burden to prove essential elements of that tort and that she seeks to recover for the same alleged conduct that supports her other claims. City Defs.' Mem. of Law 22–23; EMT Defs.' Mem of Law 17–21. Plaintiff argues that the defendants' conduct "is fairly characterized

as outrageous" and that there are disputed issues of material fact that preclude summary judgment for the defendants. Pl.'s Opp'n 27–28.

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citing *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). Courts have found defendants liable for IIED only when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (quoting *Howell*, 612 N.E.2d at 702). Under New York law, a claim for IIED may be invoked "only as a last resort," that is, where no other avenues for recovery exist. *Salmon v. Blesser*, 802 F.3d 249, 256–57 (2d Cir. 2015) (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir.2014)).

Plaintiff's IIED claim fails as a matter of law. First, plaintiff has not shown that the defendants' conduct was "extreme and outrageous." *See Nicholas v. City of Binghamton, N.Y.*, No. 10-CV-1565, 2012 WL 3261409, at *17 (N.D.N.Y. Aug. 8, 2012) (finding no IIED claim under similar circumstances); *see also Stuto v. Fleishman*, 164 F.3d 820, 828 (2d Cir. 1999) (explaining that cases in which courts have sustained claims for IIED "involve[] some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment physical threats, permanent loss of employment, or conduct contrary to public policy"). Despite plaintiff's assertion to the contrary, *see* Pl.'s Opp'n 28, *Kerman* does not suggest that it was. Although this case is analogous to *Kerman* in crucial respects discussed previously, I agree with the City defendants that it is not analogous for purposes of plaintiff's IIED claim. *See* City Defs.'

Reply Mem. 16–17. In addition to allegedly "slam[ing] the partially open door into [Kerman's] forehead, sending his eyeglasses flying and knocking him to the floor," the officers in *Kerman* allegedly held a gun to Kerman's head, said they would shoot him if he moved, dragged him on his stomach up the stairs, and kept him handcuffed and naked for an hour in view of people who had gathered to see what was going on. 261 F.3d at 233. The individual defendants' conduct in this case is not comparable.

Second, plaintiff's IIED claim is duplicative of her other claims, and thus cannot provide a separate avenue for recovery. While it is true that, in limited circumstances, some courts have sustained IIED claims even where the conduct complained of fell under other traditional tort doctrines, those cases presented exceptional facts. For example, in *Sylvester v. City of New York*, on which plaintiff relies, the court allowed the plaintiffs' IIED claims to move forward not only because the police officers "detain[ed] innocent individuals, pressure[d] them to give false statements, and ignore[d] their requests to leave police custody," but also because the police did these things "all while a family member [was] dying in a nearby hospital."[24] 385 F. Supp. 2d 431, 443 (S.D.N.Y. 2005). The court explained that even though the plaintiffs' IIED claims and false imprisonment claims overlapped, they were not wholly duplicative because the tort of false imprisonment did not cover the elicitation of allegedly false statements and the fact that the police officers' actions occurred while a family member was dying nearby. *Id.* at 443–44. Again, the conduct of which Mizrahi complains is readily distinguishable from that in *Sylvester* and falls well within the ambit of her other tort claims.

---

[24] Plaintiff conspicuously omits this last piece of information from her description of the case. *See* Pl.'s Opp'n 29 n.79.

For these reasons, I grant defendants' motions for summary judgment on plaintiff's IIED claim.

## C. NIED

Defendants also seek the dismissal of plaintiff's NIED claim. They argue that plaintiff suffered no physical injury, that she has not identified a specific duty that defendants owed her, and that her NIED claim is duplicative of her intentional tort claims. City Defs.' Mem. of Law 23–24; EMT Defs.' Mem. of Law 21–22. Plaintiff contends that she suffered physical manifestations of her emotional distress as well as severe emotional distress. Pl.'s Opp'n 29. She also argues that defendants' conduct caused her to fear for her physical safety. *Id.* at 30.

As with IIED claims, a claim for NIED under New York law requires a showing of extreme and outrageous behavior, a causal relationship between the conduct and the injury, and severe emotional distress. *See Romero v. City of New York*, 839 F. Supp. 2d 588, 631 (E.D.N.Y. 2012). A plaintiff may establish her NIED claim based on the "bystander" theory or (2) the "direct duty" theory. *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)). The "bystander" theory, which requires a plaintiff to witness the death or serious injury of an immediate family member, *see id.*, does not apply here. Under the "direct duty" theory, plaintiff must show that she "suffer[ed] emotional distress caused by 'defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety.'" *Id.* (second alteration in original) (quoting *Mortise*, 103 F.3d at 696); *see also Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 135 (E.D.N.Y. 2010) (citation and quotations omitted) ("[I]t is well settled that the circumstances under which recovery may be had for purely emotional harm are extremely limited, and thus a cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff which

either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety."). "The duty . . . must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise*, 102 F.3d at 696. New York also recognizes a cause of action in cases where there is "an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious." *Johnson v. State,* 334 N.E.2d 590, 592 (N.Y. 1975) (citation and quotations omitted).

Plaintiff has not satisfied any of the elements for her NIED claim. As with her IIED claim, plaintiff has not shown that defendants' behavior was extreme and outrageous. She also has provided no evidence of a "specific" duty owed to her by the defendants. *See Kraft*, 696 F. Supp. 2d at 424. Even if such a duty existed and was breached, plaintiff has not offered sufficient evidence that the breach unreasonably endangered her physical safety or reasonably caused her to fear for her physical safety. Simply saying so in a response to an interrogatory is not sufficient. Pl.'s Opp'n 30 n.84; *see Kraft*, 696 F. Supp. 2d at 425. Furthermore, plaintiff's situation does not rise to the level of "special circumstances" alluded to *Johnson,* in which the New York Court of Appeals upheld an NIED claim by a woman who was negligently misinformed by a hospital that her mother had died. *Johnson,* 334 N.E.2d at 591.

For these reasons, I grant defendants' motions for summary judgment as to plaintiff's NIED claim.

### D.  Negligent Training, Hiring, and Supervision

NYPH moves to dismiss plaintiff's negligent hiring, training, and supervision claim on the basis that there is no evidence to support it. EMT Defs.' Mem. of Law 26–28. The City defendants argue that plaintiff did not raise this claim against the defendant City in her Second Amended Complaint and cannot do so now in her opposition to the City defendants' motion

for summary judgment. City Reply Mem. 17–18. Plaintiff contends that her claim is viable against both institutional defendants because all of the individual defendants—both police officers and EMTs—testified that they had not received training on how to make an EDP determination. *See* Pl.'s Opp'n 30. According to plaintiff, therefore, the individual defendants' employers, the City of New York and NYPH, "failed to provide the basic training required to perform their duties and that that failure caused Mizrahi harm." *Id.* at 31.

To state a claim for negligent hiring, training, supervision or retention under New York law, "in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Tsesarskaya*, 843 F. Supp. 2d at 463–64 (quoting *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004)). "A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." *Id.* (quoting *Bouchard v. N.Y. Archdiocese,* 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010)). Crucially, the employee's allegedly unlawful conduct must occur outside the scope of employment. *See Biggs v. City of New York*, No. 08 CIV. 8123 PGG, 2010 WL 4628360, at *10 (S.D.N.Y. Nov. 16, 2010); *Colodney v. Continuum Health Partners,* Inc., No. 03 Civ. 7276, 2004 WL 829158, at *9 (S.D.N.Y. Apr. 15, 2004) ("When an employee is acting within the scope of her employment, her employer may be held liable for the employee's negligence only under a theory of *respondeat superior,* and no claim may proceed against the employer for negligent hiring or retention.").

Plaintiff's negligent training, hiring, and supervision claim fails. First, City defendants are correct that plaintiff may not raise a negligent hiring claim against the City for the first time in her opposition brief. *See Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 526–27 (S.D.N.Y. 2015). Second, all parties concede that the individual EMT defendants were acting within the scope of their employment. Plaintiff, therefore, has a claim against NYPH for vicarious liability but not for direct liability based on the hospital's own negligence. In addition, plaintiff has failed to adduce any evidence that NYPH improperly investigated either individual EMT defendant when he or she was hired or that it had reason to believe that either EMT Nelson or Abeeluck had a propensity to falsely imprison individuals. I therefore grant the defendants' motions for summary judgment as to plaintiff's negligent hiring, supervision, and retention claim.

## CONCLUSION

For the foregoing reasons, defendants' motions are granted in part and denied in part. Specifically, I deny the individual EMT defendants' motion for summary judgment on plaintiff's unlawful entry and false arrest claims under § 1983 as well as plaintiff's state false imprisonment claim. I also deny their motion for summary judgment on plaintiff's federal claims based on qualified immunity. I grant their motion for summary judgment on plaintiff's remaining state law claims. Furthermore, I deny NYPH's motion for summary judgment on plaintiff's state false imprisonment claim but grant NYPH's motion as to plaintiff's other state law claims.

As to the City defendants, I deny the defendant police officers' motion for summary judgment on plaintiff's unlawful entry, false arrest, and failure to intervene claims under § 1983, as well as plaintiff's state false imprisonment claim. I grant their motion for summary judgment on plaintiff's remaining state law claims. I deny the City's motion for summary judgment on

plaintiff's state false imprisonment claim but grant the City's motion as to plaintiff's other state law claims.

As to plaintiff, I grant her motion for partial summary judgment dismissing the individual defendants' defense of exigent circumstances for their allegedly unlawful entry into her apartment. I also grant her summary judgment on the defendant police officers' affirmative defense of qualified immunity on this basis. In addition, I grant plaintiff's motion for partial summary judgment dismissing the defendant police officers' defense of probable cause as to her false arrest claim. However, the defendant police officers' defense of qualified immunity on this claim remains open.

Therefore, the following defendants, claims, and defenses remain:

- On plaintiff's federal claims, EMTs Nelson and Abeeluck remain as defendants in the case but can be found liable only if a jury concludes that they were state actors under the "joint action" test. The individual EMT defendants cannot advance a qualified immunity defense under federal law.

- On plaintiff's unlawful entry claim, all individual defendants remain in the case. They may all advance a consent defense. The defendant police officers may also argue that they are entitled to qualified immunity on the basis of consent. However, no defendant can advance the defense of exigent circumstances, and the defendant police officers may not argue that they are entitled to qualified immunity on the basis of exigent circumstances.

- On plaintiff's federal false arrest claim, all individual defendants remain in the case. They may all advance a consent defense. The defendant police officers may also argue that they are entitled to qualified immunity on the basis of consent. No

defendant can advance the defense of probable cause. However, the defendant police officers may argue that they are entitled to qualified immunity on the basis of arguable probable cause.

- On plaintiff's failure to intervene claim, the defendant police officers remain in the case.

- On plaintiff's state false arrest claim, all defendants remain in the case.


SO ORDERED.


_____/s/_____
Allyne R. Ross
United States District Judge

Dated:      August 13, 2018
            Brooklyn, New York